### UNITED STATES v. STANDARD OIL COMPANY OF CALIFORNIA et al.

#### No. E-5.

District Court, S. D. California, N. D., Ninth Circuit.

#### Aug. 25, 1937.

John W. Preston, Sp. Counsel, and Annette Abbott Adams, Asst. Sp. Counsel, both of San Francisco, Cal., for the United States.

Oscar Lawler, of Los Angeles, Cal., Eugene M. Prince, of San Francisco, Cal., and Wm. H. Burges, of El Paso, Tex., for defendant Standard Oil Co. of California.

Ray W. Hays, of Fresno, Cal., for defendants Frank J. Carman, Elna Carman, Henry Fairbank, Charles Fairbank, and Clara Fairbank Ranney.

W. G. Griffith, of Santa Barbara, Cal., for defendant Mary Rock.

YANKWICH, District Judge.

The United States of America, as plaintiff, has instituted this suit in equity seeking to be decreed the absolute owner of certain public lands in the State of California known as section 36, township 30 south, range 23 east, M.D.B. & M. Pending for determination are the motion of some of the defendants to transfer the cause to the law side of the docket and motions of the plaintiff to strike and dismiss certain of the defenses set forth in the answers.

I. The Motion to Transfer to the Equity Side.

Consideration of this motion calls for a summary of the allegations of the bill of complaint. It asserts ownership of the section in the United States Government upon the following grounds:

(1) The land was excepted from the Government grant of school lands to the State of California by the Act of March 3, 1853 (Act March 3, 1853, c. 145, 10 Stat. 244), because it was known to be mineral in character, on January 26, 1903, at the time the official survey of the section was approved.

(2) On January 23, 1935, the Secretary of the Interior—acting in a proceeding commenced in the Department of the Interior, General Land Office, on May 8, 1925, in which the United States was plaintiff, and the State of California and Standard Oil Company and other defendants in the present suit were defendants, and in which it was charged that section 36 was mineral in char-

acter and known as such at and prior to the date of the approval of the survey by the General Land Office, on January 26, 1903—made his decision determining, as a fact, that the whole of section 36 before, on, or after January 26, 1903, was and was known to be mineral in character and that no right, title, interest, or estate in the section ever vested in the State of California or its transferees, but that title remained in the United States.

(3) A rehearing of the proceeding was denied by the Secretary on May 20, 1936, and the decision is now final and binding on this court.

(4) Each of the defendants, as transferees of the State of California, claims some interest in the property, which claims are, however, without right.

(5) The lands are a part of the United States Naval Petroleum Reserve No. 1, set apart by Executive Order of September 2, 1912, with other lands, for the exclusive use of the Navy in case of national emergency.

The bill of complaint, which is rather lengthy, after setting forth these facts, and the manner of derivation of the title of the various defendants, alleges that each of them asserts certain rights to, title or interest in, or lien upon, the lands or to the petroleum or mineral oil or gas or gasoline deposited therein or extracted therefrom, but that such claims are without right.

The following additional facts are alleged:

The defendants entered upon the lands in violation of the lawful orders and proclamations of the President of the United States; they drilled thirty-two wells and caused to be extracted and taken from the premises, oil, gas, and gasoline, appropriating the same for their use and benefit, and wasted the Government's lands and minerals and destroyed and injured them as a naval petroleum reserve. The plaintiff is unable to state the exact amount of oil, gas, and gasoline so extracted, but alleges, upon information and belief, that it exceeded 4,976,369.16 barrels of oil of a high commercial grade, exceeding in value the sum of $8,318,875.16 and 60,140,814 M.C.F. of gas exceeding in value the sum of $3,052,795.54 and 12,983,649.84 gallons of gasoline of varying values exceeding in value the sum of $1,104,798.10, to the damage of the plaintiff, which damages can only be ascertained by requiring the defendants, Standard Oil Company of California, and

Frank J. Carman, and others, to account therefor.

The complaint then alleges: "That plaintiff is informed and believes, and upon such information and belief alleges, that said defendants Standard Oil Company of California, Frank J. Carman, and the said trustees intend to continue to trespass upon said lands and to extract and appropriate oil and gas from the wells now existing on said West one-half (W½) and the West one-half of the East one-half (W½ of E½), and Lots 5, 6, 7, 8, 11, and 12 of said Section 36, and to sink and drill new wells thereon and to extract oil and gas therefrom, and will continue such drilling and such extraction and appropriation of the supply of gas and oil underlying said lands and lands adjacent thereto belonging to the United States, and to the entire exhaustion thereof, unless restrained by order of court; and the occupation and operation of said lands and the extraction of the oil and gas content thereof has been, is, and will continue to be, detrimental to and destructive of said lands and of the purposes and policy of the plaintiff with reference thereto, and an irreparable injury to said lands and to the plaintiff and the people of the United States, which cannot be compensated in damages."

The present value of the land is alleged to be in excess of $10,000,000.

Upon the basis of these and other allegations, which, for the purpose of this opinion, need not be summarized, the complaint prays:

(1) That plaintiff be decreed to be the absolute owner of the lands and the products thereof and the proceeds therefrom, and that the defendants be decreed to have no right, title, or interest in or to the same or any part thereof.

(2) That the leases, agreements, deeds, conveyances and transfers, assignments or other instruments and writings under which the defendants or any of them claims any estate, right, title, or interest in the land be declared null and void.

(3) That the defendants be required to render a full account of all their operations on the lands, of all the oil, gas, and gasoline extracted therefrom. That the plaintiff recover such amount as may be found due in kind and in money with interest and such damages as it may have sustained.

(4) That pending a determination of the suit the defendants and their officers, agents, servants, and attorneys be enjoined from trespassing on the lands and from drilling any additional wells thereon and from extracting any oil, gas, or gasoline from them, and that, upon final hearing, such injunction be made perpetual.

(5) That a receiver be appointed forthwith to take charge of all the lands and the products thereof and proceeds therefrom, with authority to conserve them under the supervision of the court pending the final determination of this suit.

(6) That the plaintiff have general relief.

Under Equity Rule 22 (28 U.S.C.A. following section 723), the defendants Standard Oil Company, Standard Gasoline Company, and Southern California Gas Company have moved to transfer the cause to the law side of the court, upon the ground that the complaint does not state facts sufficient to support equity jurisdiction and that plaintiff has an adequate legal remedy.

In applying the legislative mandate contained in section 267 of the Judicial Code (28 U.S.C.A. § 384) against entertaining suits in equity in courts of the United States in cases where a plain, adequate, and complete remedy may be had at law—which first appeared in section 16 of the Judiciary Act of 1789 (1 Stat. 82)—to suits for title or possession of real property, federal courts have held that a complainant out of possession could not maintain an equitable action in the nature of a bill quia timet to remove a cloud from his title against a defendant in possession.

This upon the theory, going back to the common law, that the legal remedy of ejectment is adequate in such cases. A motivating force for the adoption of these common-law principles was the guaranty of jury trial in actions at law by the Seventh Amendment of the Constitution. A defendant would be deprived of this valuable right if a suit in equity were sustained where the legal remedy suffices. See Scott v. Neely (1891) 140 U.S. 106, 11 S.Ct. 712, 35 L.Ed. 358. And our courts are determined to safeguard that right. These principles have been applied with great consistency. See Hipp v. Babin (1856) 19 How. 271, 277, 15 L.Ed. 633; Killian v. Ebbinghaus (1884) 110 U.S. 568, 573, 4 S.Ct. 232, 28 L.Ed. 246; Whitehead v. Shattuck (1891) 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873; Lacassagne v. Chapuis (1892) 144 U.S. 119, 12 S.Ct. 659, 36 L.Ed. 368; Johnston v. Corson Gold Mining Co. (C.C.A. 9, 1907) 157 F. 145, 146, 15 L.R.A.

(N.S.) 1078; People of Porto Rico v. Livingston (C.C.A. 1, 1931) 47 F.(2d) 712, 713; Barnes v. Boyd (C.C.A. 4, 1934) 73 F.(2d) 910. But the rule has its exceptions. They are recognized by the Supreme Court in Twist v. Prairie Oil & Gas Co. (1927) 274 U.S. 684, at page 691, 47 S.Ct. 755, 758, 71 L.Ed. 1297: "It is true that ordinarily one out of possession may not bring in a federal court a bill to quiet title, against one in possession, because there is a full, adequate, and complete remedy at law and the defendant is entitled to a jury trial. See Whitehead v. Shattuck 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873; Black v. Jackson, 177 U.S. 349, 363, 364, 20 S.Ct. 648, 44 L.Ed. 801; Lancaster v. Kathleen Oil Co., 241 U.S. 551, 555, 36 S.Ct. 711, 60 L. Ed. 1161. But the suit is of a class within the jurisdiction—that is, the power—of a federal court sitting in equity. There are cases in the federal courts in which suits in equity to quiet title brought by one out of possession against one in possession have been entertained, because of the special facts, or because of the particular relief sought, or because the defendant waived the objection of lack of equity jurisdiction." The relief which the court, in that case, deemed sufficient to distinguish the suit from *"an action at law masquerading as a suit in equity"* and to confer equity jurisdiction were: (1) A declaration of the rights of the parties to an oil and gas lease; (2) the cancellation of an agreement; (3) an injunction against the assertion of certain rights; and (4) general relief. These were declared to be "within the recognized sphere of federal equity jurisdiction." See Otoe County National Bank v. Delany (C.C.A. 8, 1937) 88 F.(2d) 238, 243, 244.

Ordinarily, seeking damages or mesne profits, in addition to possession, does not fulfill the requirements. None the less, the harshness of the rule has been relaxed, and courts, when dealing with timber, mining, or oil lands, have ruled that—because of the nature of the property, and because of the great and irreparable mischief which might flow from the destruction of the substance of the estate, through continued occupancy—equity will entertain jurisdiction, when waste or continued trespass, resulting from the cutting of timber, the taking of water, the extraction of minerals, threatens to change the entire nature of the property. The principle is stated by Mr. Justice Field in Erhardt v. Boaro (1885) 113 U.S. 537, 538, 5 S.Ct. 565, 28 L.Ed. 1116: "It was formerly the doctrine of equity, in cases of alleged trespass on land, not to restrain the use and enjoyment of the premises by the defendant when the title was in dispute, but to leave the complaining party to his remedy at law. A controversy as to the title was deemed sufficient to exclude the jurisdiction of the court. In Pillsworth v. Hopton, 6 Ves. 51, which was before Lord Eldon in 1801, he is reported to have said that he remembered being told in early life from the bench 'that if the plaintiff filed a bill for an account and an injunction to restrain waste, stating that the defendant claimed by a title adverse to his, he stated himself out of court as to the injunction.' This doctrine has been greatly modified in modern times, and it is now a common practice in cases *where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as the extracting of ores from a mine, or the cutting down of timber, or the removal of coal,* to issue an injunction, though the title to the premises be in litigation." (Italics added.)

It has been applied where continued waste or trespass related to: *Water rights* (United States Freehold Land & Emigration Co. v. Gallegos (C.C.A. 8, 1898) 89 F. 769); *timber* (Peck et al. v. Ayers & Lord Tie Co. (C.C.A. 6, 1902) 116 F. 273; A. G. Wineman & Sons v. Reeves (C.C.A. 5, 1917) 245 F. 254; F. Burkart Mfg. Co. v. Case (C. C.A. 8, 1930) 39 F.(2d) 5; and *mines and mineral lands* (Big Six Development Co. v. Mitchell (C.C.A. 8, 1905) 138 F. 279, 282, 283, 1 L.R.A.(N.S.) 332). The case last cited contains a very full statement of the rule, the reason for it, and the circumstances under which it may be applied:

"It was insisted by appellant that a court of equity had no jurisdiction, upon the pleadings and evidence, to grant the relief given by the court in this case. And at the argument it was said that this bill should not be maintained: (1) Because a bill for an injunction can only be maintained, where the title is disputed, after a trial at law, or after an action at law has been commenced; (2) because a cloud upon the title cannot be removed unless the complainant is in possession; and (3) because it seeks to enforce a forfeiture.

"The trespass here complained of, as disclosed by the record, is not an ordinary case of trespass upon lands, of temporary duration, but, as we think the evidence shows, was a continuous trespass, which

threatened to destroy the character of the property as a mine, and would render the plaintiff's interest therein valueless. Threatened and continuous injuries to mines, quarries, timber growing upon lands, buildings located thereon, or other improvements of a permanent character, are enjoined, because, as has been said, such acts 'alter the character of the property, and also tend to destroy it, and occasion irreparable loss and damage.' Courthope v. Mapplesden, 10 Ves. 290; Scully v. Rose, 61 Md. 408; Erhardt v. Boaro, 113 U.S. 537, 5 S.Ct. 565, 28 L.Ed. 1116; Jerome v. Ross, 7 Johns, Ch. [N.Y.] 315, 11 Am.Dec. 484; Hammond v. Winchester, 82 Ala. 470, 2 So. 892; Snyder v. Hopkins, 31 Kan. 557, 3 P. 367. *In such cases the threatened injuries are to the res, and diminish the value of the property itself, and an injunction will be granted to prevent the continuing waste or continuing trespass, although the plaintiff is not in possession, and although the legal title has not been settled or questioned by an action at law.* Story's Eq.Jur. § 860; Union Pac. R. Co. v. Kansas City Elevator Co. (C.C.) 17 F. 200; Earl Cupper v. Baker, 17 Ves. 128; West Point Iron Co. v. Reymert, 45 N.Y. 703; Snyder v. Hopkins, 31 Kan. [557] 559, 3 P. 367; Lacustrine Fertilizer Co. v. L. G. & Fer. Co. et al., 82 N.Y. [476], 486; Oolagah Coal Co. v. McCaleb, 68 F. [86], 87, 15 C.C.A. 270; High on Inj. 736; Allegheny Oil Co. v. Snyder, 106 F. 764, 45 C.C.A. 604; Peck v. Ayers & Lord Tie Co., 116 F. 273, 53 C.C.A. 551; Logan Nat'l Gas & Fuel Co. v. Great Southern Gas & Oil Co., 126 F. 623, 61 C.C.A. 359.

"If the only relief sought by the bill in this case was to remove the cloud upon plaintiff's title, it may well be doubted whether the bill could be sustained. Orton v. Smith, 18 How. 263, 15 L.Ed. 393; Frost v. Spitley, 121 U.S. 552, 7 S.Ct. 1129, 30 L.Ed. 1010. But the bill goes further, and seeks to enjoin the defendant from committing waste and destroying the property as a mining property. In such a case jurisdiction in equity attaches, even where the plaintiff is not in possession. And having obtained jurisdiction for that purpose, the court may, for the purpose of presenting the multiplicity of suits, retain it for further relief, and may remove a cloud upon the title, quiet the title, and determine the right of possession.

"In the Elevator Case above cited, Mr. Justice Miller said: 'When either party, lessor or lessee, claims that acts have been done which render the continuing of the relation no longer proper, such party can go into a court of equity, on general principles, and ask to have that lease set aside, canceled, and annulled. In that case the court of equity sits, holding the scales of justice evenly between the parties, and may say that it believes that such acts have been done by the lessee, for instance, as ought to determine the agreement. * * * And the court will declare the agreement at an end, and set aside and annul, and will make such orders as seem proper and right.'

"We think, both upon reason and authority, that in a case such as this, where the injury is to the res (that is to say, where irreparable mischief is being done or threatened, going to the very substance of the estate), a court of equity has jurisdiction, not only for the purpose of restraining waste or threatened trespass, but, having acquired jurisdiction for that purpose, it may also proceed to settle the question of title and to remove the cloud; and this was the view taken by the Circuit Court." (Italics added.)

The principles thus declared apply with great force to oil properties. Oil is mining, both under federal and California decisions. See Burke v. Southern Pacific R. Co. (1913) 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527; Crain v. Pure Oil Co. (C.C.A. 8, 1928) 25 F.(2d) 824; Shell Petroleum Corp. v. Caudle (C.C.A. 5, 1933) 63 F.(2d) 296; Callahan v. Martin (1935) 3 Cal.(2d) 110, 43 P.(2d) 788, 101 A.L.R. 871. And because of its fugitive nature, the danger of continued waste is greater than in the case of water, timber, or solid minerals. See Mason v. United States (1923) 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396; Jones v. Prairie Oil & Gas Co. (1927) 273 U.S. 195, 47 S.Ct. 338, 71 L.Ed. 602.

Involved here is not an individual seeking the restoration of land. The Government itself is seeking to restore to its public domain property which it alleges never left it. See Causey v. United States (1916) 240 U.S. 399, 402, 36 S.Ct. 365, 60 L.Ed. 711.

Even if we exclude the accounting features of the bill, the allegations of waste and continued trespass, coupled with the prayer seeking a decree of title in the plaintiff, the invalidation of the leases, agreements, titles, conveyances, and **other instruments affecting the title and en-**

joining their assertion, an injunction against continued trespass and a receiver, are sufficient, under the authorities cited, to give the equity side of this court jurisdiction of the bill.

■ In reaching this conclusion, we have limited our consideration to *the case made out by the bill of complaint.* See 3 Cyc. of Fed.Procedure, § 955, pp. 847, 848; Dobie on Federal Procedure (1928) pp. 700, 701; W. W. Sly Mfg. Co. v. Central Iron Works (C.C.A. 7, 1912) 201 F. 683; Bank of Palmetto v. Hyman (C.C.A. 5, 1923) 290 F. 353; Pneumatic Scale Corp. v. Mapl-Flake Mills, Inc. (D.C.Del.1928) 24 F.(2d) 602; Wright v. Barnard (D.C. Del, 1915) 233 F. 329; Lathrop v. Rice & Adams Corp. (D.C.N.Y., 1925) 6 F.(2d) 91.

This makes it unnecessary to consider how the equitable defenses of the answer affect the character of bill of complaint.

The motion to transfer to the law side of the docket is denied.

### II. The Motion to Dismiss and Strike Certain Defenses.

The motions to strike (and to dismiss) [Equity Rule 33, 28 U.S.C.A. following section 723] are directed to the defenses numbered 3, 4, and 6 to 11, inclusive. The latter group relates to the Government's assertion of title under the decision of the Secretary of Interior. They attack the adjudication and present the most fundamental question involved in the case —the determination of which will affect the entire course of the litigation. For this reason, we shall treat them first.

(1) *The Attack on the Adjudication of the Secretary of the Interior.*
(a) *The Finality of the Decision.*

■ The solution of the problem involved in the attack on the finality of the determination of the Secretary of the Interior, made on January 23, 1935, and which declared that on January 26, 1903, the lands were known to be mineral in character, calls for a discussion of the nature of the grant of the school lands to California under the Act of March 3, 1853, and of the powers of the Secretary of the Interior with relation to such lands. As a part of its policy of aiding education, the United States, from the very beginning of its existence, has made grants-in-aid to states for that purpose. These grants, as many others, were, usually, grants *in præsenti.* When they contained no mineral or other reservation, an inchoate title passed, *on the date of the grant,* which became perfect, *as of the date of the act,* upon the marking out of the land, when the survey of the land was officially accepted by the Secretary of the Interior. When this was done, the title of the state was complete, and no power was left in the courts to read or to allow the Secretary to read into the title of the state any reservations or restrictions. See Cooper v. Roberts (1855) 18 How. 173, 175, 179, 15 L. Ed. 338 *(involving the Michigan school lands);* United States v. Sweet (1918) 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473 *(involving the Utah school lands);* United States v. Morrison (1915) 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599 *(involving the Oregon school lands);* and Rogers Locomotive Machine Works v. Emigrant Co. (1896) 164 U.S. 559, 575, 17 S.Ct. 188, 41 L.Ed. 552; Little v. Williams (1913) 231 U.S. 335, 339, 34 S.Ct. 68, 58 L.Ed. 256, and Work v. State of Louisiana (1925) 269 U.S. 250, 257, 260, 46 S.Ct. 92, 95, 70 L. Ed. 259 (the last three cases arising under the Swamp Land Acts, 43 U.S.C.A. § 982 et seq.).

The effect so given to grants of this type, and which applies alike to school land, swamp land, or other grants not containing any exceptions or reservations, is stated in Little v. Williams, supra, at pages 339–340 of 231 U.S., 34 S.Ct. 68, 70, 58 L.Ed. 256:

"Although the terms of the 1st section of the act denote a present grant to the state of the 'swamp and overflowed lands, made unfit thereby for cultivation,' the 2d section lays upon the Secretary of the Interior the duty of identifying and listing the lands coming within the terms of the grant, and of causing patents therefor to be issued to the state 'at the request of' its governor, and then declares: 'And on that patent the fee simple to said lands shall vest in the said state,' subject to the disposal of its legislature. It became necessary, in Rogers Locomotive Machine Works v. Emigrant Company, 164 U.S. 559, 17 S.Ct. 188, 41 L.Ed. 552, to determine the meaning and effect of the act in the light of these provisions and of prior decisions, and it was there said [164 U.S. 559, at page 570, 17 S.Ct. 188, 41 L.Ed. 552]: 'While, therefore, as held in many cases, the act of 1850 was in præsenti, and gave an inchoate title, the lands needed to be identi-

fied as lands that passed under the act; which being done, and not before, the title became perfect as of the date of the granting act.' And again [164 U.S. 559, at page 574, 17 S.Ct. 188, 41 L.Ed. 552] 'It belonged to him (the Secretary of the Interior), primarily, to identify all lands that were to go to the state under the act of 1850. When he made such identification, then, and not before, the state was entitled to a patent, and "on such patent" the fee-simple title vested in the state. The state's title was at the outset, an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued.' What was there said has since been regarded as the settled law upon the subject. Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 592, 18 S.Ct. 208, 42 L.Ed. 591; Brown v. Hitchcock, 173 U.S. 473, 476, 19 S.Ct. 485, 43 L.Ed. 772, 773; Niles v. Cedar Point Club, 175 U.S. 300, 308, 20 S. Ct. 124, 44 L.Ed. 171, 174; Ogden v. Buckley, 116 Iowa, 352, 89 N.W. 1115; Birch v. Gillis, 67 Mo. 102; Carr v. Moore, 119 Iowa, 152, 159, 93 N.W. 52, 97 Am.St.Rep. 292.

"As this land was *never so identified,* and, so far as appears, its identification was never even requested by the state, it follows that, even if, at the date of the act, the land was in fact swamp or overflowed, the state never acquired more than an inchoate title to it,—a claim which was imperfect both at law and in equity." (Italics added.)

And see United States v. Montana Lumber & Mfg. Co. (1905) 196 U.S. 573, 25 S.Ct. 367, 49 L.Ed. 604; United States v. Bonners Ferry Lumber Co. (C.C.Idaho, 1910) 184 F. 187.

■ The authority of the Secretary of the Interior in cases of this character, in which lands pass without the necessity of a patent, is limited to marking them out by accepting the official survey. He cannot exceed that authority and require that, before asserting its title, the state establish other conditions, such as their non-mineral character. Should he attempt to do so, courts will stay his hand. See Work v. State of Louisiana, supra.

A different situation is presented by grants which except mineral and other lands.

■ Through judicial interpretation, the California school lands, granted by the United States, of which the property involved in this litigation is a part, is subject to such an exception. See Ivanhoe Mining Co. v. Keystone Consolidated Mining Co. (1880) 102 U.S. 167, 26 L.Ed. 126; Mullan v. United States (1886) 118 U.S. 271, 6 S.Ct. 1041, 30 L.Ed. 170; Work v. State of Louisiana, supra, 269 U.S. 250, at page 257, 46 S.Ct. 92, 95, 70 L.Ed. 259. The distinction between grants containing exceptions or reservations, and those not containing any, is this:

Under the former, the title becomes perfect when the land is marked out; that is, the survey is accepted. See United States v. Morrison (1915) 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599. Under the latter, if the land *is, in fact, known to be mineral, at the time of its marking out,* the title never vests, no finality attaches to the survey, and the land remains a part of the public domain, subject to entry, and in the same class with lands upon which no patents have ever been issued. See Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., supra, 102 U.S. 167, at page 175, 26 L.Ed. 126; Mullan v. United States, supra, 118 U.S. 271, at page 278, 6 S.Ct. 1041, 30 L.Ed. 170; Davis' Administrator v. Weibbold (1891) 139 U.S. 507, at page 529, 11 S.Ct. 628, 35 L.Ed. 238; Johnson v. Drew (1898) 171 U.S. 93, at pages 99, 100, 18 S.Ct. 800, 43 L.Ed. 88. The exception is, *in effect, a reservation of title, not affected by the acceptance of the survey.* The reservation is a condition precedent to the vesting of the title. If, in fact, the land is known to be mineral, title simply *does not* vest. As said by our own Circuit Court of Appeals in Johnston v. Morris (C.C.A. 9, 1896) 72 F. 890, 895: "Where such sections are found to be mineral lands, there is *an absolute loss* of such lands to the state, and, to that extent, a clear and unconditional diminution of the school land grant." (Italics added.) And see West v. Standard Oil Company (1929) 278 U.S. 200, at page 208, 49 S.Ct. 138, 139, 73 L.Ed. 265.

In Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., supra, Mr. Justice Miller used this language: "It follows from the finding of the court and the undisputed facts of the case, that the land in controversy being mineral land, and well known to be so when the surveys of it were made, *did not pass to the State under the school-section grant."* (Italics added.)

A more elaborate statement of the principle is that of Mr. Justice Field in Barden v. Northern Pacific Railroad (1894)

154 U.S. 288, at pages 313–316, 14 S.Ct. 1030, 38 L.Ed. 992. It is given in the footnote.[1]

Whether the lands were, *in fact*, mineral is a question of fact, the determination of which rests with the Land Depart-

[1] "It is also true that the grant was one in præsenti of lands to be afterwards located. From the immense territory from which the sections were to be taken, it could not be known where they would fall until the line of the road was established. Then the grant attached to them, subject to certain specified exceptions; that is, the sections, or parts of sections, which had been previously granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, were excepted, and the title of its other sections or parts of sections attached as of the date of the grant, so as to cut off intervening claimants. *In that sense the grant was a present one. But it was still, as such grant, subject to the* exception of mineral lands made at its date, or then excluded *therefrom by conditions annexed.* Whatever the location of the sections, and whatever the exceptions then arising, there remained that original exception declared in the creation of the grant. The location of the sections, and the exceptions from other causes, *in no respect affected that one, or limited its operation.* There is no language in the act from which an inference to that effect can be drawn, in the face of its declaration that all mineral lands are thereby 'excluded from its operations' and of the Joint Resolution of 1865 that 'no act of the thirty-eighth congress, (that is, of the previous session of 1864), granting lands to states or corporations, to aid in the construction of roads or for other purposes, shall be so construed as to embrace mineral lands.' * * *

"The cases cited in support of the claim of the plaintiff only show that the identification of the sections granted, and of the exceptions therefrom of parcels of land previously disposed of, leaves the title of the remaining sections, or parts thereof, to attach as of the date of the grant, *but has absolutely no other effect.* Such is the purport, and the sole purport, of the cases of St. Paul & Pacific Railroad Company v. Northern Pacific Railroad Company, 139 U.S. 1, 5, 11 S. Ct. 389, [35 L.Ed. 77] and Deseret Salt Company v. Tarpey, 142 U.S. 241, 247, 12 S.Ct. 158, [35 L.Ed. 999] cited by the plaintiff. In both of those cases the writer of this opinion had the honor to write the opinions of this court; and it was never asserted or pretended that they decided anything whatever respecting the minerals, but only that the title to the lands granted took effect, with certain designated exceptions, as of the date of the grant. They never decided anything else. And what was that title? It was of the lands which at the time of the grant *were not reserved as, minerals,* and of the lands which at the time of the location had not been sold, reserved, or to which a pre-emption or homestead right had not attached. * * * In none of them was it ever pretended that the ascertainment of the location of the lands granted operated to withdraw from the grant the reservation of the minerals then undisclosed. *The grant did not exist without the exception of minerals therefrom, and congress has declared, in positive terms, that the act shall not be construed* to embrace them; and there is nothing in any of the cases cited in the plaintiff's contention which indicates in the slightest degree that the original exception was subsequently qualified.

"It seems to us as plain as language can make it that the intention of congress was to exclude from the grant actual mineral lands, whether known or unknown, and not merely such, as were at the time known to be mineral. After the plaintiff had complied with all the conditions of the grant, performed every duty respecting it, and, among other things, that of definitely fixing the line of the route, its grant was *still limited* to odd sections which were not mineral at, the time of the grant, and also to those which were not reserved, sold, granted, or otherwise appropriated, and were free from pre-emption and other claims or rights at the time the line of the road was definitely fixed, and was coupled with the condition that all mineral lands were excluded from its operation, and that in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd sections, nearest to the line of the road, might be selected.

"There is, in our judgment, a fundamental mistake made by the plaintiff in the consideration of the grant. *Mineral lands were not conveyed,* but by the grant itself and the subsequent resolution of congress cited, were specifically reserved to the United States, and excepted from the operations of the grant. Therefore, they were not to be located at all, and, if in fact located, they could not pass under the grant." (Italics added.) Barden v. No. Pac. Ry., supra, 154 U.S. 288, at pages 313–316, 14 S. Ct. 1030, 1033, 38 L.Ed. 992.

ment. That department owes its existence to the various statutes establishing it, declaring its powers and defining the duties of the Commissioner of the Land Office and of the Secretary as to public lands. 5 U.S.C.A. § 481 et seq.; 43 U.S.C.A. § 1 et seq.; 43 U.S.C.A. § 1201. Their object (and of other statutes) is to carry into effect the constitutional policy of the United States, relating to its control over the public domain (Const. art. 4, § 3, cl. 2). They vest in the Land Department supreme authority over the lands of the United States. An entire administrative scheme is provided, aiming at their administration, control, and supervision, and the determination of adverse claims to them. In the exercise of this authority, the Land Department *acts quasi-judicially.* See Devil's Den Consol. Oil Co. v. United States (C.C.A. 9, 1918) 251 F. 548; United States v. Minor (1885) 114 U.S. 233, 243, 5 S.Ct. 836, 29 L.Ed. 110. The extent and the limitations of this power are stated in United States ex rel. McBride v. Schurz (1880) 102 U.S. 378, at pages 395, 398, 26 L.Ed. 167:

"The Constitution of the United States declares that Congress shall have power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States. Under this provision the sale of the public lands was placed by statute under the control of the Secretary of the Interior. To aid him in the performance of this duty, a bureau was created, at the head of which is the Commissioner of the General Land-Office, with many subordinates. *To them, as a special tribunal, Congress confided the execution of the laws which regulate the surveying, the selling, and the general care of these lands.*

"Congress has also enacted a system of laws by which rights to these lands may be acquired, and the title of the government conveyed to the citizen. This court has with a strong hand upheld the doctrine that so long as the legal title to these lands remained in the United States, and the proceedings for acquiring it were as yet *in fieri, the courts would not interfere to control the exercise of the power thus vested in that tribunal.* To that doctrine we still adhere.

"But we have also held that when, by the action of these officers and of the President of the United States, in issuing a patent to a citizen, *the title to the lands has passed from the government,* the question as to the real ownership of them is open in the proper courts to all the considerations appropriate to the case. And this is so, whether the suit is by the United States to set aside the patent and recover back the title so conveyed, as in United States v. Stone (2 Wall. 525 [17 L.Ed. 765]), or by an individual to cause the title conveyed by the patent to be held in trust for him by the patentee on account of equitable circumstances which entitle the complainant to such relief. Johnson v. Towsley, 13 Wall. 72 [20 L.Ed. 485], and other cases." (Italics added.)

And see Humbird v. Avery (1904) 195 U.S. 480, 503-505, 25 S.Ct. 123, 49 L.Ed. 286; Cameron v. United States (1920) 252 U.S. 450, 459-460, 40 S.Ct. 410, 412, 64 L.Ed. 659; Wilson v. Elk Coal Co. (C.C.A. 9, 1925) 7 F.(2d) 1112; Ickes v. Development Corporation (1935) 295 U.S. 639, 645, 55 S.Ct. 888, 889, 79 L.Ed. 1627; Sullivan v. Mammouth Oil Co. (C.C.A. 8, 1927) 22 F.(2d) 663.

Two conditions delimit the exercise of this power:

(1) It must occur before title has passed. See Marquez v. Frisbie (1879) 101 U.S. 473, 25 L.Ed. 800; Wilson v. Elk Coal Co., supra; State of Oregon v. Hitchcock (1906) 202 U.S. 60, 26 S.Ct. 568, 50 L.Ed. 935, and cases supra; and

(2) Finality attaches only to the determination of questions of fact. See Shepley v. Cowan (1875) 91 U.S. 330, 23 L.Ed. 424; Lee v. Johnson (1885) 116 U.S. 48, 6 S.Ct. 249, 29 L.Ed. 570; Davis' Administrator v. Weibbold, supra, 139 U.S. 507, at page 529, 11 S.Ct. 628, 35 L.Ed. 238; Corporation of the Catholic Bishop of Nesqually v. Gibbon (1895) 158 U.S. 155, at page 166, 15 S.Ct. 779, 39 L.Ed. 931; Burfenning v. Chicago, St. Paul, etc., R. R. (1896) 163 U.S. 321, 323, 16 S.Ct. 1018, 41 L.Ed. 175; Johnson v. Drew, supra; Whitcomb v. White (1909) 214 U.S. 15, 29 S.Ct. 599, 53 L.Ed. 889.

As a corollary from these fundamentals, the decisions already cited, and others to be adverted to presently, lay down these principles:

(1) Errors of the Land Department in applying the law to particular facts are reviewable.

(2) If the land has actually passed out of the hands of the United States, or was not subject to disposition, or has been reserved from a grant or sale, the Department has no jurisdiction. Davis' Administrator v. Weibbold, supra, 139 U.S. 507, at pages 529, 530, 11 S.Ct. 628, 35 L.Ed. 238.

(3) The determination of the Department may be impeached for fraud or imposition.

These limitations are summed up in Moore v. Robbins (1877) 96 U.S. 530, 535, 24 L.Ed. 848:

"The whole question, however, has been since that time very fully reviewed and considered by this court in Johnson v. Towsley, 13 Wall. 72 [20 L.Ed. 485]. The doctrine announced in that case, and repeated in several cases since, is this:—

"That the decision of the officers of the Land Department, made within the scope of their authority on questions of this kind, is in general conclusive everywhere, *except when reconsidered by way of appeal within that department;* and that as to the facts on which their decision is based, *in the absence of fraud or mistake, that decision is conclusive even in courts of justice, when the title afterwards comes in question.* But that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and in cases where it is clear that those officers have, by a mistake of the law, given to one man the land which on the undisputed facts belonged to another, to give appropriate relief.

"In the recent case of Shepley et al. v. Cowan et al. (91 U.S. [330], 340 [23 L.Ed. 424]), the doctrine is thus aptly stated by Mr. Justice Field: 'The officers of the Land Department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption. *If they err in the construction of the law applicable to any case,* or *if fraud is practised upon them,* or *they themselves are chargeable with fraudulent practices,* their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions; but, for mere errors of judgment *upon the weight of evidence in a contested case before them,* the only remedy is by appeal from one officer to another of the department.'" (Italics added.)

The determination of the character of land, as mineral or other, rests with the Land Department. Thus, Burfenning v. Chicago, St. Paul, etc., R. R. (1896) 163 U.S. 321, 323, 16 S.Ct. 1018, 1019, 41 L.Ed. 175:

"It has undoubtedly been affirmed, over and over again, that, in the administration of the public-land system of the United States, *questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact, not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions, is conclusive, and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be re-examined."* (Italics added.) And see Burke v. Southern Pacific R. R. Co. (1913) 234 U.S. 669, 710, 34 S.Ct. 907, 58 L.Ed. 1527; Cameron v. United States, supra.

It is true that these statements occur in a case in which the court was discussing the right of the Land Department to make a determination of the mineral character of land in proceedings, *prior* to the issuance of a patent. But that fact does not stand in the way of applying the principle to any other adverse proceeding in which the Land Department is asked to determine the mineral character of lands claimed under a congressional grant.

The determination involved in this case was made in an adverse proceeding instituted under the provisions of the law and the rules of the Department, to which the defendants in this case were parties. The jurisdiction of the Land Department to hear the matter was not challenged. In fact, the Standard Oil Company, a party in that case, claimed finality for the order of Secretary Fall, dismissing it. In the synopsis of the argument of the Standard Oil Company, which precedes the opinion, in West v. Standard Oil Co. (1929) 278 U.S. 200, 203, 49 S.Ct. 138, 73 L.Ed. 265, appear the following:

"The *Interior Department has jurisdiction* in the first instance to determine whether or not the land is of such character as to come within the terms of the grant. Burke v. Southern Pacific R. Co., 234 U.S. 669 [34 S.Ct. 907, 58 L.Ed. 1527].

"The contest filed in this case followed the usual procedure and raised the sole issue whether or not the land was known mineral land at the date of approval of the survey, i. e., January 26, 1903, and whether or not the title therefore had passed to the State.

*"The contest was formally decided by the Secretary.* That decision is the letter of June 9, 1921. It is in the ordinary form of judgments rendered by the Department. Ary v. Iddings, 12 L.D. 252; Coder v. Lotridge, 12 L.D. 643; John H. Reed, 6 L. D. 563; Anderson v. Northern Pacific, 7 L. D. 163; Dahlstrom v. St. Paul, 12 L.D. 59; U.S. ex rel. West v. Hitchcock, 205 U.S. 80, 27 S.Ct. 423, 51 L.Ed. 718.

*"Such decisions are judicial in character, partaking of the nature of judgments.* United States ex rel. McBride v. Schurz, 102 U.S. 378, 26 L.Ed. 167; Wisconsin Central R. R. Co. v. Price County, 133 U.S. 496, 10 S.Ct. 341, 33 L.Ed. 687; Wyoming v. United States, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742; United States v. Winona & St. P. R. Co. (C.C.A.) 67 F. 948; New Dunderberg Mining Co. v. Old (C.C.A.) 79 F. 598; Steel v. Smelting Co., 106 U.S. 447, 1 S.Ct. 389, 27 L.Ed. 226; Ellifson v. Phillips, 18 L.D. 299; Payne v. New Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680." (Italics added.)

We have no desire to bind the defendants by *any arguments* which counsel may have made in the other proceeding. *The failure to challenge jurisdiction is a fact* in that proceeding, *not an argument.* We advert to it as indicating that the jurisdiction of the Land Department to hear and determine the matter was not disputed. "Jurisdiction" means *jus dicere* — the power *to hear* and *determine.* There is no limitation that the determination of a fact be one way only. The cases just cited hold that the determination of the mineral character of land by the Land Department, in a proper proceeding, is a matter of fact, which is not subject to review. They are referred to in West v. Standard Oil Co., supra, 278 U.S. 200, at page 211, 49 S.Ct. 138, 141, 73 L.Ed. 265, where the court said: "Ordinarily, where an act granting public lands excludes those known to be mineral, the determination of the fact whether a particular tract is of that character rests with the Secretary of the Interior." And again on page 220 of 278 U. S., 49 S.Ct. 138, 144, 73 L.Ed. 265: "Authority to determine as a fact the known mineral character of the lands falls naturally to the Secretary as 'the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States' to public lands. Knight v. U. S. Land Ass'n, 142 U.S. 161, 178, 12 S.Ct. 258, 262 (35 L.Ed. 974). But that authority does not carry the power to relinquish the jurisdiction of the Depart-

ment over the land without determining, as a fact, that it was nonmineral at the time of the approval of the survey. Compare Work v. Louisiana, 269 U.S. 250, 261, 46 S.Ct. 92 (70 L.Ed. 259). The broad power of control and supervision conferred upon the Secretary 'does not clothe him with any discretion to enlarge or curtail the rights of the grantee, nor to substitute his judgment for the will of Congress as manifested in the granting act.'" In sum, given an adversary proceeding in which the right to inquire into the mineral character of lands is an issue, finality flows from the determination, *irrespective of the nature of the proceedings.* And see Corporation of the Catholic Bishop of Nesqually v. Gibbon, supra, 158 U.S. 155, at page 166, 15 S.Ct. 779, 39 L.Ed. 931; Van Ness v. Rooney (1911) 160 Cal. 131, 116 P. 392, 395, in which a writ of error was dismissed for want of jurisdiction by the Supreme Court, Roney v. Van Ness, 231 U.S. 737, 34 S.Ct. 316, 58 L.Ed. 460; Cragie v. Roberts (1907) 6 Cal.App. 309, 92 P. 97.

Let us test this group of defenses by the principles here declared. In substance, the attack upon the determination of the Secretary of the Interior is:

(1) The decision is not binding on the defendants or the court, but each and every matter which the Secretary purportedly decided is a matter as to which the courts alone can make a binding determination.

(2) If, in deciding the matter, the Secretary acted as head of a special tribunal having jurisdiction over public lands, the jurisdiction extended only to the public lands to which the United States held legal title.

(3) In deciding the question of the mineral character of the land, the Secretary purported to determine the fact upon which his own jurisdiction depended. This determination is not binding upon the defendants or the court, but must be determined de novo by the court.

(4) If section 36 belongs to the United States, it is a part of the Naval Reserve created by executive order dated September 2, 1912, and outside of the jurisdiction of the Secretary of the Interior.

(5) The jurisdiction of the Secretary in the matter was derived solely from the Joint Resolution of February 21, 1924 (43 Stats. 15). This did not give him authority to try and determine the title to section 36 or to make a binding determination affecting the title. If it gave him that power, it would be

violative of article 3 of the Constitution and the Fifth Amendment.

(6) The decision of the Secretary is arbitrary. If given effect, it would deprive the defendants of their property without due process, because,

(a) The register found that section 36 was not known to be mineral in character on January 26, 1903, and the Secretary was without authority to find to the contrary, but was bound by the register's findings.

(b) The reversal of the findings of the register and the making of contrary findings was arbitrary and contrary to law.

(7) The decision of the Secretary is based upon errors of law, as follows: The evidence and findings are insufficient to support the decision in so far as it finds that the land was known to be of mineral character. (This is particularized, as will appear in what follows.)

(8) The Secretary had no lawful power to reverse the decision of the register or the concurring decisions of the register and commissioner of the General Land Office, or the findings of the register and Commissioner simply because of a difference of opinion.

(9) He applied the wrong legal test in determining whether the land was known mineral land.

(10) His decision was based on inadmissible and incompetent evidence.

The first three grounds of attack, in effect, deny finality to the decision of the Secretary of the Interior. This upon two grounds: (1) That the determination involves a legal question; and (2) that the Secretary determined the fact upon which his own jurisdiction depended.

The theoretical discussion which precedes shows conclusively and authoritatively, we believe, that the Secretary was not called upon to determine a legal question. The court in West v. Standard Oil Co., supra, 278 U.S. 200, at page 208, 49 S.Ct. 138, 139, 73 L.Ed. 265 stated the question before the Secretary to be: "If the land was then known to be mineral, *the title confessedly did not pass by the act.* For Congress excluded mineral land from the grant. Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., 102 U.S. 167, 26 L.Ed. 126; Mullan v. United States, 118 U.S. 271, 276, 6 S.Ct. 1041 (30 L.Ed. 170). See, also, Wyoming v. United States, 255 U.S. 489,

500, 41 S.Ct. 393 (65 L.Ed. 742) ; Work v. Louisiana, 269 U.S. 250, 257, 258, 46 S.Ct. 92 [95] (70 L.Ed. 259). If it was not then known to be mineral, the legal title passed to the state on that date; for the land was within one of the sections in place designated in the granting act. United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599.; United States v. Sweet, 245 U.S. 563 [573], 38 S.Ct. 193, 62 L.Ed. 473." (Italics added.) Clearly, this decision, and others to which we have already referred, hold that the determination of the known mineral character of land involves a question of fact.

We are not dealing here with a case in which a patent or title to land has actually *passed out of* the hands of the United States. In such cases, the power of the Land Department to inquire is at an end. The character of the grant under which this land was held prevented it from vesting in the state, if it was of known mineral character. In such contingency, the title simply *"did not pass to the State under the school-section grant."* Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., supra, 102 U.S. 167, at page 175, 26 L.Ed. 126. The rights of the State, therefore, *never* attached. The land remained a part of the public domain. The title never left the Government. The state acquired none, and those who took from the state were (as said in Mullan v. United States, supra, 118 U.S. 271, at page 278, 6 S.Ct. 1041, 1045, 30 L.Ed. 170) "purchasers with notice."

Herein lies the chief distinction between these cases and cases arising under other acts or grants from which counsel seek to draw analogies.[2]

Thus, the tideland cases cannot serve as a precedent because tidelands *are not* "public lands." The decision relied upon [Borax Ltd. v. City of Los Angeles (1935) 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9] is grounded upon the proposition that the jurisdiction of the Land Department does not, *because of this,* extend to tidelands. *(See page 17 of the opinion* in 296 U. S., 56 S.Ct. 23, 80 L.Ed. 9). Cases such as Hardin v. Jordan (1891) 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428; Iron Silver Mining Co. v. Campbell (1890) 135 U.S. 286, 10 S.Ct. 765, 34 L.Ed. 155; Wright v. Roseberry (1887) 121 U.S. 488, 7 S.Ct. 985, 30 L.Ed. 1039 (also a tideland identification case) ;—and others from other

---

[2] The distinction between the two groups of cases is made very clear in United States v. Winona & St. Paul Ry. Co. (C.C.A. 8, 1895) 67 F. 948, 954–959.

fields of administrative action, do not help the defendants. They are cases in which, through a patent, an identification of lands, or otherwise, title had passed out of the United States, or the action of the Land Department or other administrative officers was, in effect, an attempt to set aside such conveyances, upon a redetermination of a case which had already been determined prior to the grant either by the act of the Department in issuing a patent or otherwise. Clearly they sought to call into action a power which only a court could exercise, upon a proper showing.[3]

Here, however, when the Secretary of the Interior determined that the lands were known mineral lands as of January 26, 1903, *he did not* divest the State of California or the defendants of any title. The mineral character of the lands being proved, the consequences which flowed from it were not a redetermination by the Secretary of the Interior of a legal title which had passed out of the public domain. He merely found that, by reason of the known mineral character of the lands, no title to them passed under the grant of January 28, 1853. This finding did not call for the annulment of any muniments of title issued by a department of the United States or by the Government itself, either in the form of a patent or a grant. If, in effect, it meant that no title existed in the defendants claiming under the State of California, it was simply because that consequence flowed necessarily from it. At most, the fact belongs to the class which the Supreme Court has designated as "quasi-jurisdictional." Of them it has said that they "are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged, and established to the satisfaction of the court, cannot be attacked collater-

ally." Noble v. Union River Logging Railroad Co. (1893) 147 U.S. 165, at page 173, 13 S.Ct. 271, 273, 37 L.Ed. 123. The court there sustained the finality of the determination of the Secretary of the Interior, under a railroad grant, that a designated railroad was entitled to the benefits of the grant. A subsequent Secretary of the Interior revoked the grant, and it was argued there, as it is argued here, that "the existence of a railroad, with the duties and liabilities of a common carrier of freight and passengers, *was a jurisdictional fact,* without which the secretary had no power to act" (Idem, at page 172 of 147 U. S., 13 S.Ct. 271, 273, 37 L.Ed. 123), and that a subsequent officer could set it aside upon proof of fraud. The court held that the act was quasi-jurisdictional and *not* subject to collateral attack, saying: "The lands over which the right of way was granted were public lands, subject to the operation of the statute; and the question whether the plaintiff was entitled to the benefit of the grant was one which it was competent for the secretary of the interior to decide, and, when decided, and his approval was noted upon the plats, the first section of the act vested the right of way in the railroad company." (Idem at page 176 of 147 U. S., 13 S.Ct. 271, 274, 37 L.Ed. 123.) And see French v. Fyan (1876) 93 U. S. 169, 23 L.Ed. 812; Vance v. Burbank (1879) 101 U.S. 514, 25 L.Ed. 929; St. Louis Smelting & Ref. Co. v. Kemp (1881) 104 U.S. 636, 26 L.Ed. 875, involving identification of swamp lands; Moore v. Robbins, supra; all of which are cited in the opinion and the doctrine of which is applied to the facts of the particular case. And see Work v. Read (1927) 57 App.D.C. 312, 23 F.(2d) 139; Albertsworth, Judicial Review of Administrative Action (1921), 35 Harvard Law Review, 127, 133, 140-142. The mere

---

[3] The analogy sought to be drawn from the deportation cases, such as Ng Fung Ho v. White (1922) 259 U.S. 276, 42 S. Ct. 492, 66 L.Ed. 938, is not helpful. The jurisdiction of the Department of Labor to inquire and to make a valid executive order of deportation is dependent upon a status—*alienage*. An assertion of citizenship raises a jurisdictional question. The burden of proving alienage is upon the Government [U. S. ex rel. Bilokumsky v. Tod (1923) 263 U.S. 149, 153, 44 S.Ct. 54, 55, 68 L.Ed. 221; Riley v. Howes (C.C.A. 1, 1928) 24 F.(2d) 686; Brader v. Zurbrick (C.C.A. 6, 1930) 38 F.(2d) 472; Palmer v. Ultimo (C.C.A. 7, 1934) 69 F.(2d) 1]; that of

proving the right to be or to remain in this country is upon the alien (8 U.S. C.A. §§ 155, 221). But even the determination of the question of alienage by the administrative officers in a deportation proceeding, after a fair hearing, is final. While the right of judicial inquiry exists, *it is not* a trial de novo, but is limited to the determination of the fairness of the hearing. If the conclusion is supported by *any testimony*, it will not be disturbed by judicial inquiry. The evidence before the administrative body will not be tested by judicial rules, nor will the reviewing court assume to determine its weight.

fact that title to the lands is asserted by the defendants does not stand in the way of the Secretary's determination of the *quasi-jurisdictional* fact of their mineral character. That lack of title in the defendants flows from such a determination does not make the fact jurisdictional. West v. Standard Oil Co., supra, holds distinctly that when an adversary proceeding relating to lands is instituted before him, the Secretary of the Interior *must* hear and determine the matter. He cannot shirk the responsibility by dismissing the proceeding. There is, therefore, not only the *right* to hear and determine, but the *duty* to do so, as well.

The defendants say that the scope of the inquiry is merely *to guide* the Secretary in his future actions. We think that the general scope of the laws relating to the public domain, and the strictness with which courts have guarded the exercise of the quasi-judicial powers of the Depart-

ment, stand in the way of such an interpretation. Clearly, powers so broad in scope, so widely exercised, and so jealously guarded by the courts are not intended merely for *departmental self-instruction*. They have that finality which attaches, even in the case of administrative bodies of more recent origin, and of more limited sphere.[4]

To give to the Secretary's decision this effect *does not* involve an unconstitutional delegation of judicial power. The Land Department is "a special tribunal with judicial functions" within the power of the Congress to ordain and establish. Courts have no supervising powers over it. See Riverside Oil Co. v. Hitchcock (1903) 190 U.S. 316, 325, 23 S.Ct. 698, 47 L.Ed. 1074; Cosmos Exploration Co. v. Gray Eagle Oil Co. (1903) 190 U.S. 301, 315, 23 S.Ct. 692, 24 S.Ct. 860, 47 L.Ed. 1064; West v. Standard Oil Co., supra.[5] The de-

---

[4] A review of the land cases would warrant the conclusion that the scope of judicial review of decisions of the Land Department is more limited than in the case of other administrative bodies. This is also the view of writers on administrative law. Albertsworth would attribute the situation to the fact that land cases *(and postal cases)* deal "*with questions of privilege conferred on individuals and not with legal rights.*" He amplifies the thought: "In the administration of public lands the general rule has been to give something for nothing, or something great for something small. The well-known example was the homestead law, where the settler secured his one hundred and sixty acres of land for $1.25 per acre. Likewise there was the Reclamation Law, under which the price of an irrigated farm unit with water rights was fixed at its proportionate share (according to acreage) of the cost of the government irrigation works by which it was watered, a price payable on long-time credit without interest. Here are almost gratuitous dealings by the government with its citizens, and it may be that the Supreme Court, in examining the findings of the Land Office on such matters takes this fact perhaps unconsciously into consideration. Moreover, it should not be forgotten that there is within the administrative system itself opportunity for review of these findings of fact, by officials who are especially trained in land law and are conversant with local conditions. Hence only limited judicial review will be granted by the Supreme Court in these determinations of fact."

Harvard Law Review, vol. 35, pp. 141, 142.

Dickinson (Dickinson, Administrative Justice and the Supremacy of Law, 1927) takes the same view:

"In disposing of public lands to private individuals the Government is in effect dispensing a bounty, and, while the distribution must, of course, be made in accordance with statutory requirements, the would-be beneficiary has no standing to object to a fairly wide latitude of discretion on the part of the land officials." Page 277.

"Where the issue is as to such a matter as the distribution of Government land to individuals on terms favorable to the latter, the policy in favor of a strict development of legal rules is weak. The same thing is true of the distribution of pensions; and, in fact, the attitude which the courts have pursued in the land cases as to questions of 'law' originated in the pension case of Decatur v. Paulding (14 Pet. 497 [10 L.Ed. 559, 609])." Page 287.

[5] Added strength is given to this conclusion by the fact that determination by the Land Department of other conditions, or facts from which exceptions to grants or the vesting of title to public lands may result, have been given like finality. Thus: United States v. Budd (1892) 144 U.S. 154, 167, 12 S.Ct. 575, 36 L.Ed. 384 (unfitness of public lands for cultivation); United States v. Mackintosh (C. C.A. 8, 1898) 85 F. 333 (that land is desert, under reclamation act); Edwards v. Bodkin (C.C.A. 9, 1918) 249 F. 562

fendants do not charge fraud. At the oral argument, their counsel disclaimed any intention to charge in the Answers, fraud upon the part of any of the officers of the Government. It follows that the departmental finality must be given its full effect, unless the other grounds are legally adequate. To these we now direct our attention.

(b) *The Effect of the Congressional Resolution of February 1, 1924.*

The Secretary's power was not limited by the Joint Resolution of February 21, 1924 (43 Stat. 15), under which he was "directed forthwith to institute proceedings to assert and establish the title of the

(abandonment of an entry); Potter v. Hall (1903) 189 U.S. 292, 23 S.Ct. 545, 47 L.Ed. 817 (whether prior entry by an entryman into prohibited territory disqualified him in race); Baldwin v. Starks (1882) 107 U.S. 463, 2 S.Ct. 473, 27 L.Ed. 526 (that claimant to pre-emption had already exercised pre-emptive right). And see Johnson v. Drew (1898) 171 U.S. 93, 18 S.Ct. 800, 43 L.Ed. 88 (whether a party was or was not in possession of a particular tract within the public domain); Rector v. Gibbon (1884) 111 U.S. 276, 289, 4 S.Ct. 605, 28 L. Ed. 427; Lindley on Mines (3d Ed.) §§ 208, 209; Lee v. Johnson (1885) 116 U.S. 48, 6 S.Ct. 249, 29 L.Ed. 570 (the character of a settlement and the intention with which it was made); Ross v. Day (1914) 232 U.S. 110, 34 S.Ct. 233, 58 L.Ed. 528 (whether lands had been improved so as to give a preferential right of selection). Courts have also followed departmental constructions of the law, even when they went to *the very authority* of the department to act in a matter. Thus: Logan v. Davis (1914) 233 U.S. 613, 34 S.Ct. 685, 58 L. Ed. 1121 (whether a person was a purchaser in good faith); Heath v. Wallace (1891) 138 U.S. 573, 11 S.Ct. 380, 34 L. Ed. 1063 (whether lands subject to "periodical overflow" are "swamp and overflowed lands"); Hastings & Dakota Ry. Co. v. Whitney (1889) 132 U.S. 357, 10 S.Ct. 112, 33 L.Ed. 363 (the sufficiency of an affidavit required of one claiming under a soldier's bounty which, *strictly speaking, was a question of law).* And see Burke v. Southern Pacific Ry. Co. (1914) 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527. Even a questionable application of a statute, if it rest on a *"possible construction,"* will be sustained. Thus Hall v. Payne (1920) 254 U.S. 342, 343, 41 S. Ct. 131, 133, 65 L.Ed. 295: "It is manifest from this statement that the petition presents a controversy over the true construction of the act of 1894. From the act, and the Secretary's decision, it is apparent that the latter was not arbitrary or capricious, *but rested on a possible construction of the act,* and one that the reported decisions of the Land Department show is being applied in other cas-

es. The direction of the act that the lands be reserved 'from any adverse appropriation' means necessarily an appropriation adverse to the state, and this gives color to the Secretary's view. *He could not administer or apply the act without construing it, and its construction involved the exercise of judgment and discretion. The view for which the relator contends was not so obviously and certainly right as to make it plainly the duty of the Secretary to give effect to it."* '(Italics added.)

Again, it is to be borne in mind that there is no abstract concept by which to judge all administrative action. Each type of administrative agency must be subjected to criteria inherent in its nature and dependent upon the interests it affects, when we come to determine the scope of judicial review of its actions. Frankfurter & Davidson (1932) Cases on Administrative Law, Pref. VII.

Yet finality of the type here under consideration can be defended even by standards applicable to bodies of more limited range than the Land Department. See cases under note 3; Kwock Jan Fat v. White (1920) 253 U.S. 454, 457, 40 S. Ct. 566, 567, 64 L.Ed. 1010; Interstate Commerce Commission v. Louis. & Nash. Ry. (1913) 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431; People of State of New York ex rel. New York & Queens Gas Co. v. McCall (1917) 245 U.S. 345, 348, 38 S.Ct. 122, 62 L.Ed. 337; Federal Trade Commission v. Curtis Publishing Co. (1923) 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; Federal Trade Commission v. Pacific States Paper Ass'n (1927) 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; The New England Divisions Case (1923) 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; Didier v. Crescent Wharf & Warehouse Co. (D.C.Cal.1936) 15 F.Supp. 91, 93. And see E. F. Albertsworth, Judicial Review of Administrative Action (1921), 35 H.L.R. 112, at 152; Cuthbert Pound, Constitutional Aspects of Administrative Law, in The Growth of American Administrative Law (1923) 100, 130. On the whole subject, see John Dickinson, Administrative Justice and The Supremacy of Law (1927) especially pages 277–287.

United States." Granted that "to institute" means "to start"; there is no limitation, in this resolution, as to the tribunals before which proceedings *should be* instituted. Their object was to assert and establish the title of the United States to sections 16 and 36. Of necessity, therefore, the authority conferred upon the Secretary was to take *all steps* which would lead to that end. If administrative proceedings could achieve it, this resolution *does not* forbid them. A final determination, through the administrative tribunals of the Land Department, *might not* succeed in giving to the United States full relief. "Legal proceedings for possession and for damages or an accounting" (West v. Standard Oil Co., supra, 278 U.S. 200, at page 219, 49 S.Ct. 138, 144, 73 L.Ed. 265) might be necessary. But neither the need for them nor the duty to institute them affect the range of the inquiry, through administrative channels. It was determined by the general principles of law, already discussed. The resolution did not restrict it. The Secretary did not need the authority of the resolution to make the inquiry. In truth, we feel that the object of the resolution was merely *to bestir* action on the part of those whom the Congress may have considered dilatory in protecting, through proper proceedings, both before the department and the courts, the interest of the Government in these lands, the defendants' claim to which had been questioned as far back as 1908. It did not grant any power which the Secretary did not possess by virtue of his responsibility for the public lands, and his control over them.

(c) *The Effect of Designation of the Lands as a Naval Reserve.*

▮ The fact that section 36 is within Naval Reserve No. 1 created by executive order of September 2, 1912, and subject to the provisions of the Act of June 4, 1920, giving the Secretary of the Navy possession of the properties within the Naval Reserve, with the duty to conserve, develop, use, and operate them (34 U.S.C.A. § 524), does not transfer to the Navy Department the right to try any questions relating to the lands over which the Secretary of the Interior has sole authority. The powers of the Navy Department, under this enactment, are delimited by the provisions of the statute. It is "to conserve, develop, use, and operate the same * * * directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil

and gas products thereof." Courts have shown reluctance to extend them. See Mammoth Oil Co. v. United States (1927) 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137; Pan-American Petroleum & Transport Co. v. United States (1927) 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734. Naval control does not extend to the trial of questions of fact, through administrative channels, over which the Secretary of the Interior, under his supervision of public lands of the United States, has sole control. See Johanson v. Washington (1903) 190 U.S. 179, 23 S. Ct. 825, 47 L.Ed. 1008; Cosmos Exploration Co. v. Gray Eagle Oil Co. (1903) 190 U.S. 301, 23 S.Ct. 692, 24 S.Ct. 860, 47 L. Ed. 1064; United States v. Hurlburt (C.C. A.10, 1934) 72 F.(2d) 427. Because, through executive action, the exploitation of certain oil-bearing lands has been turned over, as a naval reserve, to the Navy Department, we are not justified in turning that department into an administrative court, of even quasi-judicial power. The executive order does not command such consequence.

(d) *Reversal by Secretary of Register's Findings.*

A substitute register of the Land Office, on February 24, 1932, rendered a decision dismissing the proceeding. On February 23, 1933, the Commissioner of the General Land Office affirmed it "subject to the right of appeal to the Secretary of the Interior within thirty days from notice." The United States appealed to the Secretary of the Interior, who, on January 24, 1935, reversed the decision. A motion for a rehearing was denied by the Secretary on May 20, 1936.

▮ Ever since the establishment of the Department of the Interior (5 U.S.C.A. § 485), our courts have held that the Secretary's general supervision over the public lands of the United States gave him the right to *revise, change, modify,* and *reverse* the decisions of the register and the Commissioner. See Maguire v. Tyler (1869) 8 Wall. 650, 667, 19 L.Ed. 320; Snyder v. Sickles (1878) 98 U.S. 203, 211, 25 L. Ed. 97; Buena Vista Co. v. Iowa Falls & Sioux City Ry. Co. (1884) 112 U.S. 165, 5 S.Ct. 84, 28 L.Ed. 680; (*in which the Secretary reversed the Commissioner's decision*); Knight v. United States Land Association (1891) 142 U.S. 161, 179, 183, 12 S.Ct. 258, 35 L.Ed. 974; Orchard v. Alexander (1895) 157 U.S. 372, 378, 379, 15 S. Ct. 635, 39 L.Ed. 737 (involving the right

of the Secretary to supervise) ; Parsons v. Venzke (1896) 164 U.S. 89, 17 S.Ct. 27, 41 L.Ed. 360 (where the power of the Commissioner and the Secretary of the Interior to set aside a pre-emption entry approved by a local land office was sustained) ; Hawley v. Diller (1900) 178 U.S. 476, 485, 20 S.Ct. 986, 44 L.Ed. 1157 (where the right of the Secretary of the Interior to reverse a decision of the Commissioner of the General Land Office was sustained) ; Potter v. Hall (1903) 189 U.S. 292, 301, 23 S.Ct. 545, 47 L.Ed. 817. Finality attaches to the conclusions of the Secretary. Le Marchal v. Tegarden (C.C.A.8, 1909) 175 F. 682; Edwards v. Bodkin (C.C.A.9, 1918) 249 F. 562, 567. In Bowen v. Hickey (1921) 53 Cal.App. 250, 200 P. 46, 47, certiorari denied 257 U.S. 656, 42 S.Ct. 168, 66 L.Ed. 420, the court, in an opinion written by Judge Wm. P. James, now a member of this court, said: "The finding of the Secretary of the Interior on appeal in any controversy over conflicting claims to the public land is conclusive as to all questions of fact in the absence of fraud or gross mistake, and is otherwise conclusive unless there has been a clear misapplication of the law. In such exceptional cases only may the courts inquire into the matter, and, in equity, where patent has issued, adjudge the title to be in the person having the right thereto." The right of appeal existing, any rule which would deny to the head of the Department which has the final say the right to review or to reach conclusions different from that of the inferior officers would destroy its effectiveness. It would, in common parlance, make the appellate court a "yes" court with power *to hear* an appeal, but without the power *to determine it according to its own light.* It would thus make the inferior officer or tribunal the final arbiter. *He is such,* if no appeal is taken. But when an appeal is taken, by the very force of the right to appeal, the right to reverse the inferior officer exists. The register, the Commissioner and the Secretary constitute a "special tribunal" (United States v. Winona & St. Paul Ry. Co., supra (C.C.A.) 67 F. 948, at page 955), with the third member of the triumvirate, the Secretary, having the final say.

In West v. Standard Oil Co., supra, 278 U.S. 200, at page 213, 49 S.Ct. 138, 141, 73 L.Ed. 265, the court said: "For the Secretary is not obliged to employ proceedings in the local land office as the means for making the determination as to the known mineral character. He could himself hear the evidence in the first instance. Nor is he obliged, in so ascertaining the facts, to follow a procedure similar to that prescribed for the local land office. See Knight v. U. S. Land Ass'n, 142 U.S. 161, 177, 178, 12 S.Ct. 258 (35 L.Ed. 974)."

The Secretary may hear the evidence, in the first instance. If he does, he may reach his own conclusion. Or he may resort to the local office. When he does so, he *does not* surrender the power of reversing its conclusions. Conclusiveness attaches to only one stage of the proceedings— *the final conclusion, upon appeal.* See Moore v. Robbins (1877) 96 U.S. 530, 535, 24 L.Ed. 848; Knight v. U. S. Land Ass'n (1891) 142 U.S. 161, 177, 179, 181, 12 S.Ct. 258, 35 L.Ed. 974. Until that is reached, the Land Department cannot be bound. And this is true even as to an intermediate conclusion by a preceding Secretary of the Interior. See Potter v. Hall (1903) 189 U. S. 292, 301, 23 S.Ct. 545, 47 L.Ed. 817; Greenameyer v. Coate (1909) 212 U.S. 434, 445, 29 S.Ct. 345, 53 L.Ed. 587.

Nor will the courts inquire into the "extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination." De Cambra v. Rogers (1903) 189 U.S. 119, 122, 23 S.Ct. 519, 521, 47 L. Ed. 734. The defendants allege, upon information and belief, that the decision of the Secretary was not made or based upon the Secretary's own knowledge or consideration of the record. In view of the presumption of regularity which attaches to the acts of administrative tribunals, especially those of quasi-judicial power, these allegations do not plead any issuable facts. See Steel v. St. Louis Smelting & Ref. Co. (1882) 106 U.S. 447, 1 S.Ct. 389, 27 L.Ed. 226; De Cambra v. Rogers (1903) 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734; United States v. Chemical Foundation (1926) 272 U.S. 1, 14, 15, 47 S.Ct. 1, 6, 71 L.Ed. 131.

Executive officers may rely on the assistance of others. Even where the duty *"to hear"* in the first instance is imposed upon the head of a department, the evidence may be heard by others. And the conclusion will none the less be that of the head of the department, provided he adopts it as his own. See Smith v. Hitchcock (1912) 226 U.S. 53, 33 S.Ct. 6, 57 L.

Ed. 119; People's U. S. Bank v. Gilson (C.C.Mo.) 140 F. 1, 5; Lewis Publishing Co. v. Wyman (C.C.Mo.1907) 152 F. 787, 791; Crane v. Nichols (D.C.Tex.1924) 1 F. (2d) 33, opinion written by District Judge Joseph C. Hutchinson, Jr., now of the Fifth Circuit. When we are dealing with appeals, there is *no duty* to examine personally a record on review. An executive officer, in reviewing a record on appeal, may avail himself of expert assistants in summarizing the testimony or the law and make their conclusions on the facts or the result of their research on the law his own. The defendants admit that the Secretary *heard personally the argument* on appeal. There is no denial that a decision was made. It is an official record, duly filed and reported as an official adjudication by the head of the department. The complaint so alleges. We have before us a mimeographed copy which bears the facsimile of the signature of the Secretary. It consists of sixty-seven pages, letter size, single space. The decision on the denial of the rehearing is a document of twenty-four pages, also bearing the signature of the Secretary. The answer alleges, however, that "it was not lawfully made." This is a bare conclusion, in view of the allegations of the complaint. We have before us the decision which, in the language of the answer, "purports to be written" by the Secretary. It is admitted that the Secretary heard the argument. The decision bears his name. Granted that he did not examine personally the voluminous record, the hearing of the argument alone would be sufficient to justify him in determining whether he would or would not concur in the decision of the register and Commissioner.

But we take it that there would have been no denial of any right of the defendants even if the Secretary had put his signature to decisions written by others. When he did so, he adopted them as his own. That was sufficient. See cases above.[6]

The position of the defendants lacks consistency. On the one hand, they would

---

[6] The cases on which the defendants base their contention to the contrary are clearly not in point. Morgan v. United States (1936) 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 arose under the Packers and Stock Yards Act (7 U.S.C.A. § 181 et seq.). It involved an order of the Secretary of Agriculture fixing rates for marketing agencies. The statute (7 U.S. C.A. § 211) made an order of this nature dependent upon a "full hearing." The charge was made that the evidence had been taken before an examiner and that a request for a tentative report upon which oral argument might be heard before the Secretary, was denied. Although the Secretary *heard none* of the evidence or the argument, he signed the order. The court held that the proceeding was not of an administrative character, but one "looking to legislative action in the fixing of rates of marketing agency." It held that the allegations presented an issuable fact because "the Assistant Secretary, who had heard, *assumed no responsibility for the findings or order*, and the Secretary, *who had not heard, did assume that responsibility*." Morgan v. United States, supra, 298 U.S. 468, at page 479, 56 S.Ct. 906, 911, 80 L.Ed. 1288. (Italics added.) The matter there before the court was a case involving the exercise of legislative authority in which the person to whom the authority to make the whole inquiry was delegated, did not make the decision, but the person who had delegated it, did, without hearing the evidence or argument. Here we have three persons, who *together, compose the different stages of a tribunal,*—acting in the matter. The Secretary's right to act in this case was by way of appeal. *He heard the argument* and, assuming, as stated in the oral argument, that the opinion was actually written by the Solicitor of the Department, the Secretary by putting his signature to it, adopted it as his own. That suffices. The vice condemned by the case is the determination of an *original* proceeding by one who heard *neither evidence nor argument*. Morgan v. United States, supra, 298 U. S. 468, at page 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288. Here we have an appellate proceeding. The officer exercising appellate supervision heard argument. And assuming that he was bound to read the evidence, the presumption flows from the decision which he signed and which the complaint alleges in unequivocal terms that he made. Nor does City of Long Beach v. Wright (Cal.App.1933) 134 Cal.App. 366, 370, 25 P.(2d) 541, help the defendants. The court there held that only a judge who heard the evidence and made the findings could change them and enter a different judgment. The case arose under a special statute (Calif. Code of Civil Procedure, § 662) allowing a court, on motion for a new trial, to change or add to the findings, modify or vacate the judgment, and

deny to the head of a department of Cabinet rank the right to avail himself of the assistance of others in examining a record on appeal and in preparing a decision. On the other hand, they would have us attach finality to the conclusion of his subalterns whose decision he may revise or repudiate. They would, for instance, claim an authoritarian value not only for the decision of the substitute register who actually heard the evidence, but also for the decision of the Commissioner, who, in a very simple memorandum of a few hundred words, concurred with him.[7]

It is a matter of common knowledge that in reviewing the decisions of lower tribunals even the justices of the highest appellate courts of state and nation avail themselves of the research abilities of others. The law (both state and federal) provides for such research assistants, whose investigation of the facts and the law the justices may accept as their own. We feel that it would be going far afield to require the executive head of a great department of the Government, of Cabinet status, to prove that, on the review, he examined the record personally and prepared the opinion personally, upon the allegation of a litigant, *upon information and belief*, that the contrary was a fact. The fact, if material, should be based on clear proof, and none appears in the answers. But, as shown, it raises an immaterial issue, and the contention to the contrary lacks substance.

(e) *The Attack on the Sufficiency of the Evidence.*

The defendants have attacked the sufficiency of the evidence to sustain the Secretary's decision.

Granting that this ground is available [compare Hastings & Dakota Ry. Co. v. Whitney (1889) 132 U. S. 357, 10 S.Ct. 112, 33 L.Ed. 363], the specifications of insufficiency are, in reality, but a challenge of the weight given by the Secretary to certain evidence. Thus, the Secretary is charged with rejecting evidence of great weight, while giving effect to hearsay testimony and expert testimony. The department of the Interior is not bound by judicial rules of evidence. And the weight to be given by it to evidence is not subject to review. See Whitcomb v. White (1909) 214 U. S. 15, 19, 29 S.Ct. 599, 53 L.Ed. 889; Moore v. Robbins, supra; U. S. ex rel. Bilokumsky v. Tod (1923) 263 U. S. 149, 44 S.Ct. 54, 68 L.Ed. 221, and other cases cited under footnote 3; Noble v. Union River Logging R. Co., supra; Shepley v. Cowan, supra. The Secretary's determination on conflicting testimony "would ordinarily be conclusive on the courts, even *if there were demonstrable error in the admission, or appreciation of*

---

grant a new trial. The case is good law, applying to the exercise by courts of their functions. But it does not help us here. California courts recognize the right of executive officers, even when performing functions so important as fixing the limits of assessment districts under improvement acts and levying assessments, to avail themselves of the help of skilled assistants, provided their conclusions are accepted by them as their own. See Rutledge v. City of Eureka (1925) 195 Cal. 404, 234 P. 82; Gray v. City of Los Angeles (1930) 209 Cal. 502, 288 P. 673. Even Morgan v. United States, supra, concedes that, even where the head of a department is required "to hear" a matter personally, "this necessary rule *does not preclude practicable administrative procedure in obtaining the aid of assistants in the department.*" Morgan v. United States, supra, 298 U. S. 468, at page 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288. (Italics added.)

[7] We are asked by counsel to consider as an error of law, the failure of the Secretary to accept as conclusive the decision of the Commissioner. The three-page memorandum does not, in any way, indicate, nor is there anything in the record tending to indicate, that that decision, affirming the register, was arrived at by a *personal examination of the record.* On the contrary, it might well be inferred that it was based upon a comparison of the register's decision with which the Commissioner agrees with a suggested different conclusion upon the same facts by an unnamed departmental assistant. The Commissioner calls it "a paper with contrary views was prepared in this office, which I have carefully considered but with which I do not agree." The opinion states mere conclusions. It singles out for discussion only one or two contentions. By contrast, the opinions of the Secretary on the main hearing and on rehearing show a most thorough examination and study of the law and the facts. If it was made by the Solicitor of the Department, the Secretary made the result his own when he accepted the conclusions, affixed his signature to the opinions embodying them, and filed them as *his official act*, to which, absent clear and positive proof to the contrary, the presumption of legality attaches.

*evidence."* West v. Standard Oil Co., supra, 278 U.S. 200, at page 213, 49 S.Ct. 138, 141, 73 L.Ed. 265. (Italics added.) And see Quinby v. Conlan (1881) 104 U.S. 420, 426, 26 L.Ed. 800; Heath v. Wallace (1891) 138 U.S. 573, 585, 11 S.Ct. 380, 34 L.Ed. 1063; Gonzales v. French (1896) 164 U.S. 338, 342, 17 S.Ct. 102, 41 L.Ed. 548; Calhoun v. Violet (1899) 173 U.S. 60, 63, 19 S.Ct. 324, 43 L.Ed. 614; Sanford v. Sanford (1890) 139 U.S. 642, 11 S.Ct. 666, 35 L.Ed. 290; Shepley v. Cowan, supra; White v. Chan Wy Sheung (C.C.A. 9, 1921) 270 F. 764. For a learned discussion of the subject, see Harold M. Stephens, Administrative Tribunals and the Rules of Evidence (1933). The writer is now an Associate Justice of the Court of Appeals of the District of Columbia.

The legal effect of evidence is, of course, a legal question. If there is none to support a finding, it cannot stand. Interstate Commerce Commission v. Louisville & Nash R. R. (1913) 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431. So administrative bodies, especially of a regulatory nature, cannot, as a rule, act on their own information, or upon evidence not in the record. See Interstate Commerce Commission v. Louisville & Nash. R. R. supra; United States v. Abilene & So. Ry. Co. (1924) 265 U.S. 274, 288, 44 S.Ct. 565, 569, 68 L.Ed. 1016. Nor can they suppress evidence from the record. Kwock Jan Fat v. White (1920) 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010; Whitfield v. Hanges (C.C.A. 9, 1915) 222 F. 745.

There is no allegation of *total absence* of evidence. The contention is that there is no *substantial* evidence. And that contention is based upon the argument that the Commissioner considered matters which had no probative value and disregarded others which had a great or greater probative value.

As the disregard of the ordinary rules of evidence and even their violation, except in the instances already indicated, is not a ground for review even in the case of bodies of more limited power (White v. Chan Wy Sheung, supra), the contention in this respect is, at best, a criticism of the type of evidence considered and a challenge to its weight. I do not think they are available. The Secretary reviewed the matter upon the record made below. So there can be no question of any suppression of evidence or of acting upon evidence not in the record. At best, the challenge is

that he gave to certain facts 'the importance to which they were not entitled. This, too, is merely a challenge to weight.

Conditions subsequent to January 26, 1903, could be considered in determining the known mineral character of the land on that date. See Cosmos Exploration Co. v. Gray Eagle Oil Co. (1903) 190 U.S. 301, at page 314, 23 S.Ct. 692, 24 S.Ct. 860, 47 L.Ed. 1064.

No principle of law stood in the way. Even under the strict rules of evidence, opinion testimony on a geological subject, based upon subsequent conditions, may be related back and form the basis of an opinion concerning time as to which the witness had no actual knowledge, except by retrospective deductions. City of Los Angeles v. Hunter (1909) 156 Cal. 605, 105 P. 755, 758.

## (2) *Errors of Law.*

The errors of law urged against the decision may be summed up in the assertion that the Secretary applied the wrong legal test to determine whether the land was known mineral. The errors of law for which the decision of the Secretary may be reviewed are set forth in Sanford v. Sanford, supra, 139 U.S. 642, at page 647, 11 S.Ct. 666, 667, 35 L.Ed. 290: "But where the matters determined are *not properly before* the department, or its conclusions have been reached from a *misconstruction* by its officers *of the law applicable to the cases before it*, and it has thus denied to parties rights which, upon a correct construction, would have been conceded to them, or *where misrepresentations and fraud* have been practised necessarily affecting its judgment, then the courts can, in a proper proceeding, interfere and control its determination so as to secure the just rights of parties injuriously affected. Quinby v. Conlan, 104 U.S. 420, 426 [26 L.Ed. 800]; Baldwin v. Stark, 107 U.S. 463, 465, 2 S.Ct. 473 [27 L.Ed. 526]. In such cases a court of equity only exercises its ordinary jurisdiction to prevent injustice from a misconstruction of the law or the machinations of fraud." (Italics added.)

If we examine the specifications in the answer under this head, we find that aside from legal conclusions, they merely impugn the conclusion of the Secretary of the Interior as to the known mineral character of the land. It is attacked, because it is not based upon **competent evidence of the**

known mineral character of the land and because the Secretary accepted beliefs, hopes, opinions, written or oral, not grounded on actual knowledge of the land on or prior to January 26, 1903, as competent evidence. This general statement is amplified in many respects, which are no more than an attack of the reasoning by which the conclusion was arrived at. To our mind, this is not an error of law.[8]

Nor, as we shall show presently, is the failure to recognize discovery as a rule of property. An error of law arises from facts only when they have no tendency to sustain the conclusion reached. Potter v. Hall, supra, 189 U.S. 292, at page 300, 23 S.Ct. 545, 47 L.Ed. 817. No principle of law is pointed to either in the answers or in the arguments, which compels a conclusion the other way. Legal conclusions are not enough. It must appear that a fixed legal rule exists, the disregard of which has resulted in awarding the land to the wrong person. In the light of the discussion which precedes none such appears. It follows that this group of defenses do not, as they now stand, present a defense, legal or equitable, to the bill of complaint.

The motion to strike them is granted.

Exception to the defendants.

## (3) The Defense of Estoppel.

By way of estoppel, the defendants, in the third defense, have pleaded certain acts alleged to have been done and representations alleged to have been made, either by deed or act, by persons connected with, or agents of, the Government. The Govern-

ment challenges the sufficiency of this defense.

While acquiescence, delay (through lapse of time, limitations, or laches), or nonaction do not estop the Government, the doctrine of estoppel may be asserted successfully against it when it or its agents, acting within the scope of their authority, have been guilty of acts which amount to fraud and which were acted on in good faith by others to their detriment. 21 Cor.Jur. 1186 et seq.; United States v. Stinson (C.C.A.7, 1903) 125 F. 907; Id. (1905) 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724; State of Iowa v. Carr (C.C.A.8, 1911) 191 F. 257. And see Pan-American Petroleum & Transport Co. v. United States (1927) 273 U.S. 456, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734. All the conditions under which estoppel arises between individuals, i. e. (1) false representations or concealment of material facts, (2) made with knowledge to (3) a person without knowledge or means of knowledge, (4) with intention that they be acted upon, and (5) action thereon to one's prejudice [Central Improvement Co. v. Cambria Steel Co. (C.C.A.8, 1913) 210 F. 696, 718], or conditions tantamount to fraud actually acted upon [Brant v. Virginia Coal & Iron Co. (1876) 93 U.S. 326, 23 L.Ed. 927; State of Oklahoma v. Texas (1925) 268 U.S. 252, 256, 45 S.Ct. 497, 498, 69 L.Ed. 937], must coexist when estoppel is invoked against the Government. 21 Cor.Jur. 1187, 1188. In the application of these fundamental principles, certain rules have been declared by the federal courts which, if applied to the facts pleaded as estoppel under this defense, lead to the

---

[8] The contention of the defendants, if carried to its logical conclusion, would give courts absolute appellate jurisdiction over the decisions of the Land Department. This they do not have. See Craig v. Leitensdorfer (1887) 123 U.S. 189, 211, 8 S.Ct. 85, 31 L.Ed. 114. As said in Riverside Oil Co. v. Hitchcock (1903) 190 U.S. 316, 324, 23 S.Ct. 698, 701, 47 L.Ed. 1074: "Congress has constituted the Land Department, under the supervision and control of the Secretary of the Interior, a special tribunal with judicial functions, to which is confided the execution of the laws which regulate the purchase, selling, and care and disposition of the public lands. * * * The head of an executive department of the government in the administration of the various and important concerns of his office is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he is from time to time required to act. * * * Whether he decided right or wrong, is not the question. Having jurisdiction to decide at all, he had necessarily jurisdiction, and it was his duty to decide as he thought the law was, and the courts have no power whatever under those circumstances to review his determination by mandamus or injunction. The court has no general supervisory power over the officers of the Land Department, by which to control their decisions upon questions within their jurisdiction." (Italics added.) And see Ness v. Fisher (1912) 223 U.S. 683, 32 S.Ct. 356, 56 L.Ed. 610; Hall v. Payne (1920) 254 U.S. 343, 41 S.Ct. 131, 65 L.Ed. 295.

inevitable conclusion that they do not amount to such. They are:

■■■■ (1) As to public lands, the Government—in view of its unlimited control of its own domain and of the fact that in disposing of it, it "does not assume the attitude of a mere seller of real estate" [Causey v. United States (1916) 240 U.S. 399, 402, 36 S.Ct. 365, 367, 60 L.Ed. 711; Pan-American Petroleum & Transport Co. v. United States, supra, 273 U.S. 456, at pages 506, 507, 47 S.Ct. 416, 424, 71 L.Ed. 734]— is not estopped by the mistaken assertion of facts by the agents of the Land Department. Lee Wilson & Co. v. United States (1917) 245 U.S. 24, 31, 38 S.Ct. 21, 62 L.Ed. 128; Jeems Bayou Fishing & Hunting Club v. United States (1923) 260 U.S. 561, 564, 43 S.Ct. 205, 206, 67 L.Ed. 402; Cramer v. United States (1923) 261 U.S. 219, 234, 43 S.Ct. 342, 346, 67 L.Ed. 622. Of this character are the following allegations in the third defense: The suspension from entry under agricultural laws in 1900, and the relief from this suspension, in 1904, of the township in which section 36 is situated, on the ground that an examination by a special agent (contained in the so-called Ryan report) had not disclosed any indication to warrant the lands being classified as mineral (paragraphs III and IV, Third Defense). Matters relating to the issuance of the patent by the state, and the notices which preceded it (paragraphs I and II). It is obvious that if the state acquired no title to the lands, those who acquired title from it stand in no better position. The Government could not be divested of its title by any action on the part of the state. Sherman v. Buick (1876) 93 U.S. 209, 216, 23 L.Ed. 849. Nor, under the authorities cited, is the allegation as to the statement of the Register of the United States Land Office at Visalia made to the Surveyor General of California that there were no adverse claims on record against that section (paragraph IV), a ground of estoppel. See, also Cosmos Exploration Co. v. Gray Eagle Co. (1903) 190 U.S. 301, 23 S.Ct. 692, 24 S.Ct. 860, 47 L.Ed. 1064. The price at which the land was held and the failure to redeem it, *for taxes in the sum of $3.28,* prior to the application of the defendants' predecessors— Hay and Buffington—for certificates of purchase from the state (paragraph V).

■■■■ (2) No estoppel can arise by reason of the recognition of the validity of a claim by persons without authority. Government agents have no right to make arrangements, agreements, or representations which the law does not sanction. And those who deal with them are charged with notice of this limitation of their powers. See Whiteside v. United States (1876) 93 U.S. 247, 23 L.Ed. 882; Hawkins v. United States (1877) 96 U.S. 689, 24 L.Ed. 607; Pine River Logging & Improvement Co. v. United States (1902) 186 U.S. 279, 291, 22 S.Ct. 920, 46 L.Ed. 1164; Cramer et al. v. United States, supra; Utah v. United States (1932) 284 U.S. 534, 545, 52 S.Ct. 232, 235, 76 L.Ed. 469; Wilber National Bank v. United States (1935) 294 U.S. 120, 123, 55 S.Ct. 362, 363, 79 L.Ed. 798.

■■■ To this group belongs the offer alleged to have been made by the defendants' predecessor to the Secretary of the Navy in 1917, to convey, under certain conditions, the Hay parcel to the United States for naval reserve purposes and the refusal of the Secretary of the Navy to accept the offer on the ground that the parcel was valueless as a naval reserve because it did not contain oil in commercial quantities; and the statements of other persons during the hearings held in 1916–1917 on a proposed leasing bill known as H.R. 406, 64th Congress (paragraph IX).

■■■ (3) No estoppel can arise from acceptance of money. Causey v. United States, supra; Pan-American Petroleum & Transport Co. v. United States, supra; Moses v. United States (1897) 166 U.S. 571, 17 S.Ct. 682, 41 L.Ed. 1119; Cramer v. United States, supra; Wilber National Bank v. United States, supra; United States v. Nez Perce County (D.C.Idaho, 1936) 16 F.Supp. 267, 269. Or by payment of money or receiving benefits. Ward v. United States (1870) 10 Wall. 593, 19 L.Ed. 1033; Titus v. United States (1874) 20 Wall. 475, 22 L.Ed. 400; Moses v. United States, supra.

■■■ To this group belong the allegations as to the payment of taxes to the State Government and income taxes to the Federal Government (paragraph XV), the allegations as to the consideration paid for the property (paragraph X), and the expenditures on it both before (paragraph XIII) and after (paragraph XIV) the ruling in West v. Standard Oil Company, supra.

■■■ Even if some of these are treated as allegations of benefits received by the Government, they do not constitute estop-

pel. If made in good faith, they may be pleaded as a set-off. City of Mobile v. Sullivan Timber Co. (C.C.A.5, 1904) 129 F. 298. They are so pleaded in the fifth defense.

■ (4) No estoppel arises from mere delay, acquiescence, or nonaction, even if it results in inducing expenditures. See cases under (1); also City of Mobile v. Sullivan Timber Co., supra. Many of the allegations grouped under the preceding subdivisions are vulnerable under this principle also.

■ (5) No estoppel arises from inconsistent action. See Lee Wilson & Co. v. United States, supra; Jeems Bayou Fishing & Hunting Club v. United States, supra; Cramer v. United States, supra. Of this character are the allegations as to the knowledge of the defendants' claim in 1914, through a proceeding instituted by the Government that ·year (paragraph XII). This allegation has also the vice that it relates to a public proceeding. Such proceeding carried notice to all. Or, at least, it being a matter of public record, was a means of knowledge. No estoppel can arise where the means of knowledge are available to both sides. Brant v. Virginia Coal & Iron Co. (1876) 93 U.S. 326, 23 L.Ed. 927; Commercial Inv. Trust v. Bay City Bank (C.C.A.6, 1933) 62 F.(2d) 735, 736; Lancashire Shipping Co. v. Elting (C.C.A.2, 1934) 70 F.(2d) 699, 701.

The remaining allegations are not classifiable under any particular heading.

■ They are: That delay has brought loss of evidence (paragraph XVI). This is not an element of estoppel. It is an element of laches. And laches do not affect the rights of the Government. See United States v. Insley (1889) 130 U.S. 263, 266, 9 S.Ct. 485, 32 L.Ed. 968; Stanley v. Schwalby (1893) 147 U.S. 508, 515, 13 S. Ct. 418, 37 L.Ed. 259; United States v. Carbon County Land Co. (C.C.A.10, 1931) 46 F.(2d) 980, affirmed 284 U.S. 534, 52 S. Ct. 232, 76 L.Ed. 469; United States v. Dewey County (D.C.S.D.1926) 14 F.(2d) 784.

■ The rule of property alleged to arise from the discovery rule will be treated separately further on in the opinion. We state as our conclusion that, as the rule is not available as a defense, it cannot be pleaded as an estoppel (paragraphs VI to VIII). As to these matters, it is to be observed that if—as the court held in West

v. Standard Oil Co., supra, 278 U.S. 200, at page 214, 49 S.Ct. 138, 142, 73 L.Ed. 265—the Secretary had no authority to relinquish the right of the United States to these lands and was bound, *before so doing,* to determine their known mineral character, any intervening failure on the part of the Land Department, whether it be the promulgation of erroneous rules of proof or the nonassertion or delay in asserting the rights of the United States to them—cannot create an estoppel against the Government or affect the finality of the Secretary's action. A departmental rule of proof cannot replace a duty to determine imposed by law. See 21 Cor.Juris 1191.

The allegation of reliance on these statements and representations and the like (paragraph XVIII), being merely in support of the others, falls with them.

The motion to strike the third ·defense is granted.

Exception to the defendants.

### (4) *The Defense of Discovery as a Rule of Property.*

In certain portions of the third defense (paragraphs II, and VI to VIII, inclusive) and in the fourth defense, the defendants have pleaded as a rule of property that, on January 26, 1903, and before, under the statutes of the United States, the decisions of the United States courts, and the regulations and decisions of the Department of the Interior, each legal subdivision of California school section was of known mineral character or not, depending on whether minerals had been discovered thereon or not; that the title of the state or its grantees was not affected or to be affected by any discovery of mineral after approval of the survey. No petroleum or petroleum gas was discovered on or under section 36 until on or about January 5, 1919, and no mineral was exposed before that date. The first discovery of petroleum or petroleum gas in township 30—23 or elsewhere in the Elk Hills, wherein section 36 is located, was in 1911, and no mineral was exposed therein prior to 1911. The rule of property is alleged to be "that each legal subdivision of a California school section was not of known mineral character unless the existence of minerals therein or thereon, in such quantity and under such conditions as to make extraction thereof practicable and profitable, was actully known to the community generally or else disclosed by workings or other conditions obvious to

anyone making a reasonable inspection of the premises. The existence of minerals in Section 36, or in any division thereof, was not so known or known at all until long after January 26, 1903." (Paragraph VII, Third Defense.)

Lands were not considered of mineral character unless proof thereof was specific and based upon actual production of minerals (paragraph VIII, Third Defense). This rule of property could not be changed so as to affect the defendants' title (paragraph II, Fourth Defense).

We consider these contentions. Under the Act of March 3, 1853, as interpreted by the courts, lands known to be mineral at the time of their identification by survey were excepted from the California school grant and the state was entitled to lands of equal quantity in lieu thereof. Applications for lieu selections were to be made to the Department of the Interior. On March 6, 1903, the Department of the Interior promulgated certain rules relating to lieu selections which, so far as material here, were:

"Rule 1: When a school section is identified by the Government survey and no claim is at the date when the right of the State would attach, if at all, asserted thereto under the mining or other public land laws, *the presumption arises that the title to the land has passed to the State,* but this presumption may be overcome by the submission of a satisfactory showing to the contrary. Applications presented under the mining laws covering parts of a school section will be disposed of in the same manner as other contest cases.

"Rule 2: The State will not be permitted to make selection in lieu of land within a school section alleged to be mineral in character and for that reason excepted from its grant, whether returned by the surveyor-general as mineral or otherwise, in the absence of satisfactory proof that the base land was known to be chiefly valuable for mineral at the date when the State's right thereto would have attached, if at all. *The proof must show the kind of mineral discovered upon the land and the extent thereof, when and by whom the discoveries were made,* as far as practicable, whether any claim to the land was asserted under the mining laws at the date when the State's right thereto attached, if at all, and if so by whom, *the nature and ex-*

*tent of the mining improvements placed upon the land by the mineral claimant, and what efforts have been and are being made to develop the land in good faith for mineral purposes.* If, in any case, the proof does not clearly show that the base land was known to contain valuable mineral deposits, and *to be chiefly valuable on account of such deposits,* at the date the State's right would have attached thereto, *a selection in lieu thereof will not be permitted.* A certificate of the proper authorities that the base lands have not been sold, encumbered or otherwise disposed of must also be furnished."

"Rule 6: A determination by the land department that a portion of the smallest legal subdivision in a school section is mineral land, will place that entire subdivision in the class of lands that may be used as a basis for indemnity or lieu selection." (Italics added.)

The essence of the argument on this defense is that the discovery rule controlled both under these regulations and under prior decisions. For this reason, it is claimed that it inured to the benefit of the defendants so as to entitle them to rely upon it, *before the Land Department and in this litigation,* as a rule of property to protect its title against the claims of the Government.

A rule of property is a settled legal principle governing the ownership and devolution of property. 54 Cor.Jur. 110.

When courts of last resort, *especially in interpreting statutes,* have announced certain definite principles relating to the acquisition of real property and the principles "have been long established, frequently recognized and conformed to, and property rights have been acquired thereunder, it has generally been held that such decisions should not be overturned, although the principles announced therein might otherwise be questioned." See American Mortgage Co. v. Hopper (C.C.A. 9, 1894) 64 F. 553, 554; and see Douglas v. County of Pike (1879) 101 U.S. 677, 687, 25 L.Ed. 968.

They become then a rule of property. The courts which have promulgated them may change them, but such change can work prospectively but not retrospectively.[9]

---

[9] We give the rule in the unqualified form in which it is stated by the defend-
ants. It so appears in some of the older decisions. However, in a recent decision

Departmental rules *may* be given a similar binding effect. See United States v. Burlington, etc., R. R. (1878) 98 U.S. 334, 341, 25 L.Ed. 198; California v. Deseret Water, etc., Co. (1917) 243 U.S. 415, 421, 37 S.Ct. 394, 61 L.Ed. 821.

Has the discovery rule contended for by the plaintiff existed *so continuously*, has it been *so consistently* applied and followed in determining the character of land as to have become a rule of property on January 28, 1903?

In the United States law of mining, discovery has always been a prerequisite to the location of any mining claim. It applied to both lode and placer locations. "No location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located." 30 U.S.C.A. § 23. At all times, discovery has been held to confer certain rights or claims to reward. In the location of mines, it is the first and essential step. No rights can be acquired without it. See Erhardt v. Boaro (1885) 113 U.S. 527, 535, 5 S.Ct. 560, 28 L.Ed. 1113.

By "discovery" is meant not mere indications, but a quantity of mineral sufficient to warrant the making of expenditures. 2 Lindley on Mines (3d Ed.) § 335, et seq.; § 437 et seq.; Creede & Cripple Creek Mining & Mill. Co. v. Tunnel Min. & Transp. Co. (1905) 196 U.S. 337, 25 S.Ct. 266, 49 L.Ed. 501; Erwin v. Perego (C.C.A. 8, 1899) 93 F. 608, 611; Chrisman v. Miller (1905) 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770; Nevada-Sierra Oil Co. v. Home Oil Co. (C.C.Cal.1899) 98 F. 673. But while these principles were applied in determining locations under the liberal rules promulgated by the courts in relation to them, they were not the sole determining factors governing the action of the Land Department in classifying lands. Especially was this true as to coal and oil lands. Lindley says:

"Of course, exploitation on adjacent lands might raise a strong presumption that a given tract contained petroleum. An oil-producing well within each of four sections of land surrounding a fifth would produce a conviction that the oil deposit was underneath the fifth section. This fact might justify the land department in classifying the section in the category of mineral lands, or the government surveyor in returning it as such, but it would not dispense with the necessity of making a discovery.

*"It is impossible to lay down any arbitrary rule to govern all cases as to what may be sufficient discovery upon which to predicate a location. It is a question of fact, to be determined from a consideration of all the circumstances and surroundings."* Lindley, op. cit. at 1026. (Italics added.)

Even in the case of placer gold, the exploitation of adjacent lands and deductions by those experienced in mining have an important role in determining whether there is or is not discovery. Cascaden v. Bortolis (C.C.A. 9, 1908) 162 F. 267, 271, 15 Ann.Cas. 625. Thus, the general rule was that the mineral character of lands—especially as to coal and oil—*could not be* determined by any outcroppings or other single characteristics. Seepages of oil were held insufficient. No particular structural characteristic of the land was seized upon in order to determine its character. While no claim could be made by a person to lands, without discovery, lands could be declared by the Land Department to be known mineral, although there had been *no discovery,* or actual production. For the determination of that question by administrative or judicial processes, any competent, relevant evidence, any deductions by men skilled in the field, based upon observable or deducible facts or indicia upon the land or in its vicinity or upon deductions from the geological formation of the area, disclosures or other surrounding or external circumstances, could be relied upon. Actual exposure of the mineral was not essential or even necessary. See Diamond Coal & Coke Co. v. United States (1914) 233 U.S. 236, 248, 34 S.Ct. 507, 58 L.Ed. 936.

While assertions of the discovery rule may be found prior to 1903, it had not

---

of the Supreme Court, Mr. Justice Cardozo questions whether courts *may not* apply new principles retroactively, without infringing upon due process. Great Northern Ry. v. Sunburst Oil & Ref. Co. (1932) 287 U.S. 358, 362, 363, 53 S.Ct. 145, 147, 148, 77 L.Ed. 360, 85 A.L.R. 254. In Tidal Oil Co. v. Flanagan (1924) 263 U.S. 444, 450, 44 S.Ct. 197, 198, 68 L.Ed. 382, the court says: "The parties to this action have been fully heard in the state court in the regular course of judicial proceedings and in such a case the mere fact that the state court reversed a former decision *to the prejudice of one party does not take away his property without due process of law."* (Italics added.) And see Fleming v. Fleming (1924) 264 U.S. 29, 44 S.Ct. 246, 68 L.Ed. 547.

reached the status of a definite rule of long standing guiding the Department with reference to the classification of oil lands. See Don C. Roberts (1913) 41 L.D. 639; Holter v. Northern Pacific Ry. Co. (1901) 30 L.D. 442. In 1905, the decision in the absolute form claimed for it by the defendants was repudiated by the Secretary, who promulgated the regulations of 1903 [Report of Commissioner (1905) 34 L.D. 194].

Our highest courts have not recognized the existence of the rule. They have held that geological deductions and inferences might be determinative of the mineral character of land and have stated that there is no fixed rule that lands become valuable for minerals only through their actual discovery within the boundaries. In Diamond Coal & Coke Co. v. United States (1914) 233 U.S. 236, 249, 34 S.Ct. 507, 512, 58 L.Ed. 936, the contention was made that "lands *cannot* be regarded as coal lands unless coal in quantity and of quality to render its extraction profitable is actually disclosed within their bounds." Repudiating it, the court said: "There is no fixed rule that lands become valuable for coal only through its actual discovery within their boundaries. On the contrary, they ·may, and often do, become so through adjacent disclosures and other surrounding or external conditions; and when that question arises in cases such as this, any evidence logically relevant to the issue is admissible, due regard being had to the time to which it must relate." The same principle was applied to oil lands in the Elk Hills District, *the very district in which the lands in suit are located.* See United States v. Southern Pacific Co. (1919) 251 U.S. 1, 40 S.Ct. 47, 64 L.Ed. 97. And see: Milner v. United States (C.C.A. 8, 1915) 228 F. 431; Dunbar Lime Co. v. Utah-Idaho Sugar Co. (C.C.A. 1926) 17 F. (2d) 351; West v. Standard Oil Co., supra; United States v. Southern Pacific R. R. Co. (D.C.Cal.1926) 11 F.(2d) 546, opinion written by our colleague, Judge Wm. P. James.

We are satisfied that the rule of discovery for which the defendants contend, if it ever existed, was not a fixed rule of statutory interpretation, *so long established and so uniformly recognized and conformed to* in the acquisition of rights to mining property, as to entitle it to be considered a rule of property in 1903 or at any other time.[10]

But even if it be conceded that it existed at the time the property was acquired by the defendants, this would avail them naught, because we are satisfied that *it did not exist* at the time of the acceptance of the survey, *on January 26, 1903.*

The acquisition of the title to the property was as follows: The section is divided into three parts, designated as the Hay, Carman, and Greeley parcels. On August 24, 1908, J. W. Hay and Mason W. Buffington made application to the state to purchase at the statutory price of $1.25 per acre. They received their certificates in January and February, 1909. The portion of the section bought by Hay was conveyed to Oscar Sutro prior to patent, the state patent being issued to Sutro on January 31, 1910. He conveyed the land to the Standard Oil Company, for whom he was acting as agent in the transaction, and that company transferred it to its successor, the defendant Standard Oil Company of California. The part of the section purchased by Buffington included the Carman and Greeley parcels for which the state patent was issued to Buffington on January 20, 1910. By mesne conveyance the title to the Carman parcel passed to the defendants Carman and his wife and the defendant trustees under the will of Charles O. Fairbank, deceased. The defendant Standard Oil Company of California claims the Hay parcel in fee. It claims an interest in the Carman parcel under an operating agreement with the claimants of title to the Carman parcel. The Greeley parcel is no longer in the case, except for the interest of the Standard Oil Company of California and for claims against it and against the defendants Standard Gasoline Company and Southern California Gas Company as purchasers of gas products from it.

At best, the rule of property is a rule of necessity. It postulates the frailty of judi-

---

[10] This conclusion is deducible from the authorities cited. The extended treatment which the problems here involved have required makes it unnecessary and inadvisable to elaborate further on this point or to review, in detail, all the court and departmental decisions to which the research of counsel has called our attention. We add that the cases relating to "known mines," as that phrase is used in the pre-emption act of 1841 (5 Stat.,453), are of no assistance, as these terms are narrower than the phrase "known mineral lands," in school grants and later pre-emption statutes. Lindley on Mines, (3d Ed.) § 209.

cial judgment. It safeguards rights to property against changing judicial thought.

■ However, before setting up a judicial declaration as a rule of property, we should require, at least, that it be fixed, long-continued, and relied upon by persons acquiring property, so that its repudiation would amount to a denial of due process. See Fleming v. Fleming, 264 U.S. 29, at page 31, 44 S.Ct. 246, 247, 68 L.Ed. 547. The principle should not be extended to executive departments, except in the clearest instances of long and continued promulgation and reliance.

The rule of property asserted here, if it was ever given definite form by the Department, came into being on the day of the promulgation of the rules of March 6, 1903. Our highest courts do not recognize that it ever existed in the form claimed for it here. It could not inure to the benefit of the State of California as of the date of the acceptance of the survey—January 26, 1903.

Subsequent events show that it was not recognized as a fixed rule either by the Department or by the courts at the time the defendants here acquired their properties. As we view it, *it does not exist today.* To recognize it, therefore, as a bar to the Government's claim of title for the benefit of defendants whose predecessors did not acquire title at a time when it had become a rule of property (*if it ever did*), is to set up a vested right upon a nonexistent factual bottom.

Respect as we must have for the property rights of individuals; protect them as we must against encroachment even by the sovereign—we should, nevertheless, not go to this romantic length, when a sovereign asserts that property claimed by others never left the public domain.

The motion to strike the fourth defense is granted.

### (5) *The Defense of Title.*

■ The conclusions reached on the special defenses just discussed call for the denial of the motion to strike directed to specific allegations in these defenses (portion B, specifications III, IV, and V of the motion, and their subdivisions). The motion to strike portions of the first and second defenses which set forth the defendants' title (portion B, specifications I and II of the motion and their subdivisions) will also be denied. Granted that some of the allegations are legal conclusions, they do not vitiate or harm the pleading. They do

set forth the facts upon which the defendants' claim of title rests. As such, they are material to the determination of the controversy. See Edwards v. Bodkin (C. C.A. 9, 1918) 249 F. 562, 564; Commander Milling Co. v. Westinghouse Electric & Mfg. Co. (C.C.A. 8, 1934) 70 F.(2d) 469, 473.

Leave will be granted to the defendants to amend their answers, if so advised, within twenty days.